[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 1.]

DEROLPH ET AL., APPELLEES, *v*. THE STATE OF OHIO ET AL., APPELLANTS.

[Cite as *DeRolph v. State*, 2000-Ohio-437.]

*Constitutional law—Education—Schools—Defendants provided with more time to comply with Section 2, Article VI of the Ohio Constitution—Supreme Court declines to appoint special master to oversee state's further efforts to comply with Section 2, Article VI—Supreme Court maintains continuing jurisdiction with matter continued to June 15, 2001.*

1.  "[T]he sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools," but rather a thorough and efficient system of common schools. *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776, approved and followed.

2.  "The attainment of efficiency and thoroughness in that system" of common schools is "expressly made a purpose, not local, not municipal, but state-wide." *Id.*, approved and followed.

3.  A thorough system means that each and every school district has enough funds to operate. An efficient system means one in which each and every school district in the state has an ample number of teachers, sound buildings that are in compliance with state building and fire codes, and equipment sufficient for all students to be afforded an educational opportunity.

(No. 99-570—Submitted November 16, 1999—Decided May 11, 2000.)

APPEAL from the Court of Common Pleas of Perry County, No. 22043.

————————————

{¶ 1} In *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), at the syllabus, this court determined that "Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools

throughout the state." For the background and procedural history of the events that led up to that opinion, see 78 Ohio St.3d at 193-195, 677 N.E.2d at 734-735.

{¶ 2} In *DeRolph I*, this court recognized that a new funding system could not be crafted and implemented without time and deliberation. Therefore, we stayed the effect of our decision for twelve months, *id*. at 213, 677 N.E.2d at 747, in order to give the General Assembly time to enact remedial legislation. We remanded the cause to the trial court, ordering the trial court to "retain jurisdiction until the legislation is enacted and, in effect, taking such action as may be necessary to ensure conformity with this opinion." *Id*.

{¶ 3} In entries issued after that decision, this court expounded on its order of remand to the trial court. In particular, in response to a request from the defendants for clarification and reconsideration of the decision, this court stated that local property taxes could be part of the revised funding plan, but property taxes could not be the primary means of funding a thorough and efficient system of schools. 78 Ohio St.3d 419, 678 N.E.2d 886, 887. Furthermore, this court stated that, consistent with the *DeRolph I* decision, upon remand to the trial court the parties could present evidence regarding the enacted remedy, to establish whether the remedy satisfied the Thorough and Efficient Clause of the Ohio Constitution. 78 Ohio St.3d at 420-421, 678 N.E.2d at 887-888. The parties could then appeal the trial court's ruling directly to this court, for final determination. *Id*. at 421, 678 N.E.2d at 888.

{¶ 4} From August 24, 1998 through September 3, 1998, the trial court held a hearing on the General Assembly's efforts in the wake of *DeRolph I* to create a new funding method. Plaintiffs, who continued to assert that Ohio's system of funding public education is unconstitutional, are essentially the same plaintiffs who pressed that position in *DeRolph I*. The defendants argued that the revised system complies with the Ohio Constitution.

**{¶ 5}** During the hearing, the trial court propounded inquiries to this court. This court responded by stating that (1) the remand to the trial court involved the Thorough and Efficient Clause of the Ohio Constitution and did not involve the Equal Protection Clause, and (2) the state bore the burden of production and proof on remand, and was required to show by a preponderance of the evidence that the Constitution had been satisfied in order to prevail. 83 Ohio St.3d 1212, 699 N.E.2d 518, 518-519.

**{¶ 6}** After extensive briefing and the presentation of a great deal of evidence, the trial court issued its decision on February 26, 1999. The decision, reported at (1999), 98 Ohio Misc.2d 1, 712 N.E.2d 125, is two hundred sixty-three pages in length in the Ohio Official Reports. Upon determining that the state had failed to implement a complete systematic overhaul of Ohio's school-funding system, the trial court concluded that the state had failed to meet its burden of proof that it had complied with the requirements of the Ohio Constitution. *Id*. at 263, 712 N.E.2d at 297.

**{¶ 7}** The cause is now before this court pursuant to the defendants' appeal as of right from the trial court decision, under the procedures established in *DeRolph I* and subsequent orders of this court.

———————————

*Bricker & Eckler, L.L.P., Nicholas A. Pittner, John F. Birath, Jr., Sue Wyskiver Yount, Quintin F. Lindsmith* and *Susan B. Greenberger*, for appellees.

*Betty D. Montgomery,* Attorney General, *Mary Lynn Readey, Roger F. Carroll* and *James G. Tassie*, Assistant Attorneys General; *Jones, Day, Reavis & Pogue* and *Jeffrey S. Sutton; Dinsmore & Shohl, L.L.P.,* and *Joel S. Taylor*, for appellants.

*Joseph P. Sulzer*, urging affirmance for *amici curiae* members of the Ohio House of Representatives John R. Bender, Jack Ford, Barbara C. Pringle, Daniel Metelsky, Charles A. Wilson, Jr., Troy Lee James, Barbara Boyd, William L. Ogg,

Tom Roberts, David Hartley, Jerry Krupinski, Sylvester Patton, Jr., Sean D. Logan, Joe Sulzer, William Healy, June H. Ferderber, Peter Lawson Jones, Dale Miller, Betty Sutton, Vernon Sykes, Samuel Britton, Dixie J. Allen, Darrell Opfer, Erin Sullivan, John E. Barnes, Jr., Bryan Flannery, L. George Distel, Jeanine Perry, Chris Verich, Catherine L. Barrett, Robert Gooding, Joyce Beatty, Ray Miller, and Shirley A. Smith; and Ohio Senators Ben Espy, Leigh Herrington, Daniel Brady, Robert F. Hagan, Michael C. Shoemaker, Mark Mallory, and C.J. Prentiss.

*Walter & Haverfield, James E. Betts* and *Frederick W. Whatley*, urging affirmance for *amicus curiae* Alliance for Adequate School Funding.

*Raymond Vasvari* and *Gino J. Scarselli*, urging affirmance for *amicus curiae* American Civil Liberties Union of Ohio Foundation, Inc.

*Means, Bichimer, Burkholder & Baker Co., L.P.A., Kimball H. Carey* and *Katherine A. Francis*, urging affirmance for *amici curiae* Buckeye Association of School Administrators, Ohio School Boards Association, and Ohio Association of School Business Officials.

*Patrick F. Timmins, Jr.*, urging affirmance for *amicus curiae* Coalition of Rural and Appalachian Schools.

*Louis B. Geneva Co., L.P.A.*, and *M. Jayne H. Geneva*, urging affirmance for *amici curiae* Coalition for School Funding Reform, Cleveland Heights-University Heights City School District, East Cleveland City School District, Grand Valley Local School District, Lakewood City School District, Shaker Heights City School District, Waverly City School District, and Coalition for Greater Cleveland's Children.

*Courtney Williams*, urging affirmance for *amicus curiae* League of Women Voters of Ohio.

*Bernard Cohen*, urging affirmance for *amicus curiae* Ohio Association of Child Caring Agencies.

*John T. Ryerson*, urging affirmance for *amicus curiae* Ohio Association for Gifted Children.

*Buckley King & Bluso, Robert J. Walter* and *Thomas C. Drabick, Jr.*, urging affirmance for *amicus curiae* Ohio Association of Public School Employees (OAPSE)/AFSCME Local 4, AFL-CIO.

*Christopher Lopez; Kalniz, Iorio & Feldstein Co., L.P.A., Ted Iorio, Christine A. Reardon* and *Donato Iorio*, urging affirmance for *amicus curiae* Ohio Education Association.

*Schnorf & Schnorf Co., L.P.A., David M. Schnorf* and *Johna M. Bella*, urging affirmance for *amicus curiae* Ohio Federation of Teachers.

*Ohio Legal Rights Service* and *Susan G. Tobin*, urging affirmance for *amicus curiae* Ohio Legal Rights Service.

*Ennis, Roberts & Fischer* and *C. Bronston McCord III*, urging affirmance for *amicus curiae* West Clermont Local School District Board of Education.

*John M. Haseley*, urging affirmance for *amicus curiae* United States Congressman Ted Strickland.

*Chester, Willcox & Saxbe* and *John J. Chester*, urging reversal for *amicus curiae* Governor Bob Taft.

*Benesch, Friedlander, Coplan & Aronoff, L.L.P.*, and *N. Victor Goodman*, urging reversal for *amici curiae* Richard H. Finan, President of the Ohio Senate, and Jo Ann Davidson, Speaker of the Ohio House of Representatives.

―――――――――――

**ALICE ROBIE RESNICK, J.**

I

BACKGROUND AND INTRODUCTION

{¶ 8} In *DeRolph I*, after an exhaustive review of the evidence, a majority of this court concluded that Ohio's system of primary and secondary public schools in place at that time fell well short of the mandate of Section 2, Article VI. *DeRolph*

*I* recognized that, despite the earnest efforts of the General Assembly, it was simply impossible to characterize the existing system as "thorough and efficient." Accordingly, this court declared the system unconstitutional and stated that the General Assembly must devise and implement a new "thorough and efficient" system.

{¶ 9} Now, this court is called upon to consider the same basic constitutional question that was before us in *DeRolph I*—Can the revised system be characterized as thorough and efficient pursuant to Section 2, Article VI of the Ohio Constitution? Although the key inquiry is the same, the specifics of that inquiry have changed commensurately with the state's attempts to institute the necessary reforms. Therefore, realizing that legislation involving schools is an ongoing and ever-changing process as new laws are continuously enacted and former laws are constantly amended or repealed, it is incumbent upon us to examine the extent of those reforms to consider whether the mandate of the Constitution has been satisfied.

{¶ 10} The benchmark of our inquiry remains the Thorough and Efficient Clause, as set forth in Section 2, Article VI of the Ohio Constitution:

"The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State * * *."

{¶ 11} We reiterate the standard for a thorough and efficient system of common schools as set out in *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776:

"This declaration is made by the people of the state. It calls for the upbuilding of a system of schools throughout the state, and the attainment of efficiency and thoroughness in that system is thus expressly made a purpose, not local, not municipal, but state-wide.

6

"With this very purpose in view, regarding the problem as a state-wide problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state.

"A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part or any number of the school districts of the state lacked teachers, buildings, or equipment."

{¶ 12} Furthermore, in *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 387, 12 O.O.3d 327, 338, 390 N.E.2d 813, 825, this court observed that a school system could not be thorough and efficient if any school district in Ohio "was receiving so little local and state revenue that the students were effectively being deprived of educational opportunity." See, also, *DeRolph I*, 78 Ohio St.3d at 204, 677 N.E.2d at 741, citing both *Miller* and *Walter* with approval.

{¶ 13} In *DeRolph I*, 78 Ohio St.3d at 212, 677 N.E.2d at 747, this court identified four aspects of the school-funding scheme in place at that time that contributed "to the unworkability of the system and which must be eliminated." Those four aspects were "(1) the operation of the School Foundation Program, (2) the emphasis of Ohio's school funding system on local property tax, (3) the requirement of school district borrowing through the spending reserve and emergency school assistance loan programs, and (4) the lack of sufficient funding in the General Assembly's biennium budget for the construction and maintenance of public school buildings."

{¶ 14} This court, in declaring the statutes unconstitutional, stated in *DeRolph I* at 213, 677 N.E.2d at 747, that "[b]ecause of its importance, education should be placed high in the state's budgetary priorities. A thorough and efficient system of common schools includes facilities in good repair and the supplies,

materials, and funds necessary to maintain these facilities in a safe manner, in compliance with all local, state, and federal mandates."

{¶ 15} The defendants claim that they have enacted a package of remedial legislation that meets and even exceeds the requirement for a system that is both thorough and efficient. Defendants argue that the decision of the trial court should be reversed and ask this court to "give the new, ongoing remedy a chance to succeed."

{¶ 16} Plaintiffs, on the other hand, urge this court to find that the state has fallen woefully short of its obligations to craft a thorough and efficient system. Plaintiffs argue that this court should affirm the judgment of the trial court, which was in their favor on every significant point. Furthermore, plaintiffs request that this court (1) declare that the right to an education is a fundamental right under the Ohio Constitution, with a corresponding duty on the state to justify any disparities in the funding system; (2) specify what programs and services must be provided to children at every level, in order to define what level of educational opportunities must be made available; (3) retain jurisdiction of the case and direct the parties to a settlement conference under the supervision of a special master; and (4) issue an interim funding order that, among other things, requires the state to fund the foundation level at $5,051 per pupil, updated for inflation from FY99, and also requires the state to fund school facilities at a minimum level of $1 billion for each fiscal year.

{¶ 17} In *DeRolph I*, 78 Ohio St.3d at 198, 677 N.E.2d at 737, this court stated that "Ohio's statutory scheme for financing public education is complex." In addition, this court noted that "[s]chool funding has been, and continues to be, a Herculean task." *Id*. at 211, 677 N.E.2d at 746. These remarks apply with equal force to the system now at issue. In fact, the educational system continues to be *extraordinarily* complex, and as evidenced by the record now before us, reforming that system continues to be a task of unparalleled magnitude. It is impossible to

overstate the scope of the challenge presented to the state by this case.  This case implicates more than just funding; it also involves other complex intertwined issues.

{¶ 18} The General Assembly must give this problem its undivided attention.  If it is not addressed and solved immediately, it will only increase in magnitude.  For example, the 1990 Ohio Public School Facility Survey determined that Ohio's public primary and secondary schools then needed $10.2 billion for building repair and construction.  In 1997, the Legislative Budget Office completed a study and concluded that the need had risen to a staggering $16.5 billion, with the state's share estimated to be $7.2 billion and the local share estimated at $9.3 billion.  In a 1996 report of the United States General Accounting Office, Ohio was ranked very near the bottom among the states in many categories regarding the condition of its school facilities, and was ranked dead last among the states in percentage of schools with at least one inadequate building feature.  Furthermore, Ohio was ranked forty-eighth among the fifty states in percentage of schools reporting the need to spend money to repair or upgrade schools to good overall condition, with more than ninety-five percent of Ohio schools needing to spend for that improvement.  In a report released in March 2000 concerning construction expenditures for school facilities, the General Accounting Office found that the national average annual state construction expenditure per student for FY90 through FY97 was $473.  Ohio ranked fortieth among the states, with an average annual expenditure for the time period of $274 per student.  School Facilities, Construction Expenditures Have Grown Significantly in Recent Years, GAO/HEHS-00-41 (Mar. 3, 2000) 29-30.

{¶ 19} Other statistics also illustrate the magnitude of the school-funding challenge.  There are six hundred eleven separate school districts in this state and forty-nine joint vocational school districts.  There are approximately 1.8 million school children in primary and secondary public schools in Ohio and approximately

one hundred eight thousand public school teachers. There are approximately three thousand nine hundred public school buildings in the state. Appropriations for primary and secondary education account for about forty percent of the state's overall budget for this biennium, with more than $6.5 billion appropriated for FY00 for primary and secondary education out of a total state budget of more than $16.2 billion. For FY01 the appropriation is more than $6.9 billion for primary and secondary education out of a total state budget of more than $17.2 billion. These numbers reflect only the share contributed by the state for the funding of primary and secondary education and do not include the federal and local shares.

{¶ 20} In FY97, a statewide total of more than $10 billion in local, state, and federal funds was spent on primary and secondary education. The federal government's contribution was approximately six percent of that total. Considering only the combined state and local revenues of the districts, the state contribution was about 43.8 percent, and the local share was about 56.2 percent. These statistics illustrate the accuracy of this court's observation in *DeRolph I*, 78 Ohio St.3d at 199, 677 N.E.2d at 738, that "Ohio relies more on local revenue than state revenue, contrary to the national trend."

{¶ 21} The Ohio school-funding system's reliance on local revenue, chiefly in the form of local property taxes, is one aspect of the overall system with deep historical roots. In Ohio, as in many other states, the tradition of using local property taxes as the primary means to fund public schools has been entrenched since early statehood. See, *e.g.*, 19 Ohio Laws 51, 55. As we recognized in *DeRolph I*, Ohio is just one of many states in recent years to face the fundamental problems caused by an overreliance on local property taxes.

{¶ 22} The inherent inequities of funding systems that rely too much on local property taxes not only are extremely difficult to rectify, but also run counter to our Constitution's explicit requirement for a *statewide* system of public schools. The valuation of local property has no connection whatsoever to the actual

education needs of the locality, with the result that a system overreliant on local property taxes is by its very nature an arbitrary system that can never be totally thorough or efficient. In a very real sense, this problem underlies most of the other deficiencies in Ohio's school system and is either the direct or indirect cause of them. The majority and all three separate concurring opinions in *DeRolph I* specifically recognized the inadequacies of a system that is overreliant on local property taxes.

{¶ 23} We recognize that the problems associated with school funding being faced by recent and current sessions of the General Assembly are not of recent vintage. Many of the current deficiencies in school-funding policies arose over a long time and are the products of the failure for so many years of legislators who have long since retired to appropriately place education as a high priority in the state budget. To a significant degree, current members of the General Assembly have inherited a problem that has been coming to a head for many years. Our current legislators must confront problems that General Assembly members of the past were reluctant to address because education was simply not in the forefront of public concerns. Education was too often ignored, and issues relating to it were too often given short shrift.

{¶ 24} Many factors have contributed in recent years to make what had been a problematical system into one that has reached crisis proportions throughout the state. The problems have escalated in part due to "unfunded mandates" imposed by the state and federal governments, causing the cost of educating our children to rise dramatically. Even when the state or federal government does fund a particular program or endeavor, significant associated local costs may be incurred. Increased costs for numerous programs and needs, such as special education, R.C. 3323.04, vocational education, R.C. 3313.90, gifted-student programs, R.C. 3313.21, transportation, R.C. 3327.01, facilities improvements (*e.g.,* asbestos abatement and wiring for technology, as well as day-to-day maintenance on deteriorating

buildings), compliance with the Americans With Disabilities Act, Sections 12101 *et seq.*, Title 42, U.S.Code, employee costs (*e.g.,* benefits such as health care, and for teacher certification, licensing, and development), increased staffing needs (*e.g.*, additional teachers of science, math, and computer skills, and speech, hearing, and psychological educational aides), textbooks and supplies, R.C. 3315.17(A), science labs, computers and other technology purchases, summer school remediation, dropout-prevention programs, adolescent-pregnancy programs, Head Start and preschool programs, adult-literacy programs, substance-abuse-prevention programs, school lunch and breakfast programs, R.C. 3313.813(C), and a myriad of other things, have exacerbated problems that seem less and less manageable as total expenditures continually rise within a system impeded by the arbitrariness of its revenue stream.

{¶ 25} It is apparent that the task of passing and implementing legislation involving education is exceedingly complex—studies must be conducted, experts must be consulted, goals must be formulated, and priorities set. There are many options to choose from, and deciding upon the best option and then reaching a consensus are formidable undertakings. In addition, a consensus must be reached in a climate in which other budgetary considerations are always present, with other spending priorities constantly lobbying for their own larger pieces of the limited state budget pie. Political realities, such as an individual legislator's reelection concerns, also complicate the effort to devise a fair and adequate system. These budgetary and political concerns must yield, however, when compliance with a constitutional mandate is at issue. The task is difficult enough in prosperous times, when the state's coffers are full. However, the funding system that is devised must be solid enough that it can also function in an economic downturn, because a consistent revenue stream is an absolute necessity for a thorough and efficient system.

{¶ 26} Because the arguments before both the trial court and this court focused so narrowly on school funding, it is extremely important to recognize that funding is only one aspect of a thorough and efficient system of schools. We would be remiss if we failed to acknowledge that thoroughness and efficiency embrace far more than simply adequate funding. Even if the system were very generously funded, if other factors are ignored, it might still not be thorough and efficient. If teachers are ill prepared and students are unaware of what is expected of them, then our state has failed them. If students have access to the latest technology but cannot take advantage of it, then our state has failed them. If students have the most up-to-date textbooks but cannot comprehend the material in those books, then our state has failed them.

{¶ 27} The definition of "thorough and efficient" is not static; it depends on one's frame of reference. What was deemed thorough and efficient when the state's Constitution was adopted certainly would not be considered thorough and efficient today. Likewise, an educational system that was considered thorough and efficient twenty-five years ago may not be so today. Moreover, it is impossible to generate an all-inclusive list that specifically enumerates every possible component of a thorough and efficient system. In light of this, we offer the following guidance: A thorough system means that each and every school district has enough funds to operate. An efficient system is one in which each and every school district in the state has an ample number of teachers, sound buildings that are in compliance with state fire and building codes, and equipment sufficient for all students to be afforded an educational opportunity.

{¶ 28} In November 1998, former Governor George Voinovich requested a study by a group of experts, Achieve, Inc.,[1] the purpose of which was to provide

---

1. According to its own description:

"Achieve, Inc., is an independent, non-profit, bipartisan organization created by the nation's governors and business leaders to help them follow up on the commitments made at the 1996 National Education Summit. Its twelve member Board of Directors includes former Governor

incoming Governor Robert Taft and the new State Superintendent of Education, as well as legislators and others, a candid assessment of the strengths and weaknesses of Ohio's reform strategy. When completed in March 1999, the Achieve, Inc. Report made the following observations:

"Ohio can be proud of a substantial set of policy initiatives it has launched in the 1990s, and of the deepening investments it has made in educational improvement. Since Fiscal Year 1991, state education funding has increased by approximately 50 percent, twice the rate of inflation. The increase has been greatest for low-wealth districts. Legislation already enacted guarantees an additional 40 percent increase in state aid over the next five years.

"Over and above these increases in general state aid for education, there have been substantial new investments in early childhood education, technology, facilities, and urban education, and major policy initiatives to overhaul teacher education and strengthen public accountability for results. Each of these initiatives deserves comment, for each could be an important element in a comprehensive state strategy to close the gap in student and school performance."

{¶ 29} In some ways, funding is the most easily quantifiable of the many factors that play a part in establishing a thorough and efficient system of schools. When considering the per-pupil spending disparities and the inadequacies in facilities that have of late characterized our system of schools, it is evident that some of the most glaring problems are engendered by inadequate funding. Therefore, remedying those problems is naturally of paramount importance. Yet

---

Voinovich and John Pepper, Chairman of Procter & Gamble and Chairman of the Ohio Business Roundtable. Achieve provides advice and assistance to state policy leaders on issues of academic standards, assessment, and accountability. It has a small staff, augmented by a team of Senior Associates, and conducts much of its work in partnership with other education and business organizations. To carry out this review, Achieve drew upon three of its Senior Associates—Denis Doyle, Diane Ravitch, and Warren Simmons—as well as Susan Traiman, who directs The Business Roundtable's education work. The review team was headed by Achieve's President, Robert Schwartz, and was assisted by Seth Reynolds, graduate student at Harvard University's Kennedy School of Government."

all of the other requirements of a thorough and efficient system of education must be developed along with funding. Ensuring adequate school funding is simply one of the means to reach the end—with the end being a statewide thorough and efficient system of schools that is adequately funded and that has statewide standards for success.

{¶ 30} Even though remedying the scheme for school funding is not an end unto itself, it is an important step in establishing the type of school system that the Constitution requires. No one can ensure that adequate facilities and educational opportunities will lead to the success of the students of this state. One thing that is apparent, though, is that substandard facilities and inadequate resources and opportunities for any of those students are a sure formula for failure.

{¶ 31} Our decision in *DeRolph I* required the General Assembly to respond to the untenable funding situation that had developed over time. Rather than allowing the *status quo* to continue, we realized that we could not, in good conscience, ignore the overwhelming evidence before us that our statewide system of public schools was simply not a thorough and efficient system. Significant changes had to be made in the way primary and secondary public education is funded, and if it took a judgment of this court to make those changes happen, then so be it.

{¶ 32} We fully realize that no miraculous alternatives will suddenly appear and make the General Assembly's task any easier. In order to create a thorough and efficient system of statewide common schools, hard choices must be made. Moreover, because the stakes in this endeavor cannot be overestimated—we are dealing with the futures of the children of this state and in reality the very future of our state—the course must be stayed. As past experience has shown, the longer an inadequate funding system is allowed to continue, the more difficult it is to reform the system. The General Assembly should not allow the momentum of recent efforts to be impeded for any reason. Everyone's cooperation and best efforts are

required as we strive to ensure that educational opportunities are available to all children in this great state, not just those residing in affluent suburbs or in well-to-do neighborhoods.

{¶ 33} Throughout its history, this case has presented two contradictory features that have made it difficult for all parties involved, including the courts of this state, to define the roles of those charged with solving the system's problems. On the one hand, the courts of this state are entrusted with the authority to determine whether a school-funding scheme complies with the Constitution. See *DeRolph I* at 198, 677 N.E.2d at 738. However, this court in *DeRolph I* did not require a specific funding scheme and did not instruct the General Assembly as to what legislation should be enacted, leaving it to the General Assembly to determine the specifics of the remedial legislation. *Id*. at 212-213, 677 N.E.2d at 747. The reason for this is the doctrine of separation of powers. The legislature has the power to draft legislation, and the court has the power to determine whether that legislation complies with the Constitution. However, while it is for the General Assembly to legislate a remedy, courts *do* possess the authority to enforce their orders, since the power to declare a particular law or enactment unconstitutional must include the power to require a revision of that enactment, to ensure that it is then constitutional. If it did not, then the power to find a particular Act unconstitutional would be a nullity. As a result there would be no enforceable remedy. A remedy that is never enforced is truly not a remedy.

{¶ 34} Thus, it might be tempting for this court to do its own analysis, for example, determining the level of funding per pupil to achieve a thorough and efficient system, and then ordering that amount of funding. For instance, we conceivably could simply order, as plaintiffs request, that the foundation amount be set in excess of $5,000 per pupil for FY00, and order the General Assembly to fund that amount. However, this court respectfully declines to pursue that course. That degree of involvement in fashioning a remedy in this case is not, nor should

16

ever be, how we perceive our role. Our role, as we have declared in past cases, is to decide issues of constitutionality—not to legislate, as some may believe.

II

SUMMARY OF LEGISLATIVE ACTIVITY

{¶ 35} A substantial amount of legislation has been enacted since *DeRolph I* was decided. There are indications that Governor Taft and the General Assembly have taken some of the steps necessary to remedy a situation that has been neglected for more than twenty-five years. We now examine the laws that have been enacted in response to *DeRolph I*. Before we consider the specifics of the legislation in context, we summarize the developments that have occurred. The key initiatives include:

- Am.Sub.S.B. No. 102 ("S.B. 102") (signed into law on May 20, 1997) created the Ohio School Facilities Commission (see R.C. 3318.30), transferred responsibility for the Classroom Facilities Assistance Program from the State Board of Education to that commission, required that commission to establish the Emergency School Building Repair Program (see R.C. 3318.35), and instituted and authorized money for the so-called Big Eight Repair Program for major renovations and repairs of school facilities in some of the largest school districts in the state (Section 7 of the Act).

- Am.Sub.H.B. No. 215 ("H.B. 215") (the Biennial Budget Bill for FY98 and FY99, signed into law on June 30, 1997) made adjustments in the basic aid formula amount (R.C. 3317.022) and made other changes to R.C. Chapter 3317. It also provided additional equity aid (Section 50.05 of the Act; see R.C. 3317.0213), additional funding for textbooks (Section 50.16), additional funding for facilities (Section 188), and additional funding for the SchoolNet (Section 69.01) and SchoolNet Plus (Section 69.03) programs, as well as creating and providing initial funding for the Disability Access Program (Sections 50 and 69).

- Am.Sub.S.B. No. 55 ("S.B. 55") (signed into law on August 22, 1997), the student and school district "Academic Accountability Bill," established school district performance standards (R.C. 3302.02) and school district report cards (R.C. 3302.03), increased high school graduation requirements (R.C. 3313.603), and instituted a "fourth-grade guarantee," preventing students who do not pass the fourth-grade proficiency test from advancing to the fifth grade unless exceptions apply (R.C. 3313.608).

- Sub.H.B. No. 412 ("H.B. 412") (signed into law on August 22, 1997), the "School District Fiscal Accountability Act," requires school districts to maintain budget reserves (former R.C. 5705.29[K], now R.C. 5705.29[H]) and requires set-asides for building maintenance (R.C. 3315.18) and textbooks and instructional materials (R.C. 3315.17), and created the school district solvency assistance fund (R.C. 3316.20).

- Am.Sub.H.B. No. 650 ("H.B. 650") (signed into law on February 13, 1998) and Am.Sub.H.B. No. 770 ("H.B. 770") (signed into law on June 17, 1998) make up the heart of the General Assembly's remedy. H.B. 650's stated purpose is "to establish a new system for funding education." H.B. 770, among other things, modified some of H.B. 650's provisions. This legislation set out the essence of the current R.C. Chapter 3317 school-funding formula, including the base cost amount and the adjustments and subsidies. It also provided money for school facilities. H.B. 650 at Section 14.

- Am.Sub.H.B. No. 850 ("H.B. 850") (the capital appropriations bill for the biennium ending June 30, 2000, signed into law on December 17, 1998) provided money for school facilities, some specified for districts with exceptional needs. Sections 6 and 26 of the Act.

- Am.Sub.H.B. No. 282 ("H.B. 282") (the biennial Education Budget Bill for FY00 and FY01, signed into law on June 29, 1999) marks the first time that the

state has created an education budget separate from its main operating budget, by placing the education budget into its own bill. H.B. 282 made adjustments to the R.C. 3317.02 per-pupil formula amount, and made other adjustments in the R.C. Chapter 3317 funding formula, enacted R.C. Chapter 3324 pertaining to gifted students, and provided additional money for SchoolNet plus. Section 11 of the Act.

- Am.Sub.H.B. No. 283 ("H.B. 283") (the Biennial Budget Bill for FY00 and FY01, signed into law on June 30, 1999) the main operating budget bill for the biennium, allocated state budget surplus revenue to SchoolNet Plus and for school facilities, with some of the facilities money to go to districts with exceptional needs. Section 124 of the Act.

- Am.Sub.S.B. No. 192 ("S.B. 192") (signed into law on March 3, 2000) provided for the allocation of money received by the state pursuant to the Tobacco Master Settlement Agreement, committing a significant amount of tobacco settlement funds for school construction and repair. R.C. 183.02(F) and 183.26. See, also, Section 17 of the Act.

{¶ 36} In addition, other initiatives are pertinent to our inquiry, including Am.Sub.H.B. No. 1 ("H.B. 1") (signed into law March 30, 1999; implemented the OhioReads initiative); Am.Sub.S.B. No. 1 (signed into law May 6, 1999; established school safety zones); and Senate Joint Resolution No. 1 (concurred in by the House on May 4, 1999), which placed on the November 2, 1999 ballot a proposed constitutional amendment (ultimately approved by the voters of the state) to allow the state to issue general obligation bonds to pay for school facilities (Sections 2n and 17, Article VIII).

III

REMEDIAL LEGISLATION AND ITS EFFECTS

{¶ 37} We will now examine the foregoing legislation and assess its compliance with Section 2, Article VI of the Ohio Constitution.

{¶ 38} We emphasize that due to the extent of some of the legislation, especially H.B. 650 and H.B. 770, our discussion of it is not in any way intended to be exhaustive.

A

*Cost of an Adequate Education*

{¶ 39} In *DeRolph I*, this court noted that Ohio's system of public education is a "statewide system" and admonished the General Assembly to "create an entirely new school financing system." *Id.*, 78 Ohio St.3d at 213, 677 N.E.2d at 747.

{¶ 40} An essential aspect of the school-funding program contained in R.C. Chapter 3317 is "basic state aid," which provides eligible school districts with a guaranteed minimum amount of support. R.C. 3317.022. It is dependent on the base cost, calculated as the unweighted average cost per student of educating students who were enrolled in a school district that in fiscal year 1994 met seventeen out of eighteen performance criteria and that was not excluded on the basis of wealth or income. R.C. 3317.012(B).

{¶ 41} In determining basic state aid, several components are considered in calculating the amount a school district will receive: the guaranteed minimum dollar level of financial support (the formula amount), the district's cost-of-doing-business factor, average daily membership ("ADM"), adjusted total taxable value, and the charge-off amount. R.C. 3317.022.

{¶ 42} A district's cost-of-doing-business factor is based on the cost of goods and services in the county where the district is located. R.C. 3317.02(N)(1). Since the cost of goods and services is not uniform throughout the state, the cost-of-doing-business factor is intended to put all school districts on a more level playing field.

{¶ 43} The ADM represents the number of students enrolled in a given school district and is calculated pursuant to R.C. 3317.03(A). R.C. 3317.02(D)(1).

If it is more advantageous, a district may use a "three-year average formula ADM" to calculate its ADM. R.C. 3317.02(D)(2); 3317.022(A).

{¶ 44} A school district's "adjusted total taxable value" is defined in R.C. 3317.02(W) and 3317.022(A)(2).

{¶ 45} The "charge-off amount" defines a district's responsibility for its portion of the funding requirement. To calculate the charge-off amount, a district's adjusted total taxable value is multiplied by the charge-off rate, which is currently twenty-three mills ($0.023) per dollar of valuation. R.C. 3317.022. Subtracting the charge-off amount from the rest of the formula yields the amount of basic state aid the district will receive. *Id.*

{¶ 46} All of these variables function together so that the amount that an eligible district will receive from the state as basic aid can be determined. The current formula for basic state aid is: Cost-of-doing-business factor × formula amount × (the greater of formula ADM or the three-year average of formula ADM) – (0.023) (adjusted total taxable value). R.C. 3317.022(A)(1). The formula demonstrates that as more per-pupil revenue is generated locally, the state's contribution declines.

{¶ 47} The formula amount is the "base cost for the fiscal year specified in section 3317.012," adjusted with a phase-in. R.C. 3317.012(B) sets forth the criteria used by the General Assembly to determine the base cost figure for FY96. This number was then adjusted for inflation at an annual rate of 2.8 percent. R.C. 3317.012(A). Consequently, the base cost per pupil in FY00 is $4,177 and in FY04 will be $4,665. *Id.*

{¶ 48} The base cost figure is phased in over a period of three years. R.C. 3317.02(B). Commencing in July 2001, and every six years thereafter, the President of the Senate and the Speaker of the House of Representatives are required to appoint three members to a committee, which will reexamine the cost of an adequate education. R.C. 3317.012(C). This is certainly a positive step in

view of the fact that the cost of an adequate education in Ohio had not been determined since 1973-1974. *DeRolph I*, 78 Ohio St.3d at 261, 677 N.E.2d at 780 (Resnick, J., concurring).

{¶ 49} In addition to the basic aid, the state provides funding for certain programs and school district operations individually, according to formulas established by the General Assembly. Such programs include funding for special education, R.C. 3317.022(C), education for gifted students, R.C. 3317.024(P), vocational education, R.C. 3317.022(E), transportation, R.C. 3317.024(E) and 3317.07, and Disadvantaged Pupil Impact Aid ("DPIA"), R.C. 3317.029. These supplemental expenditures are often referred to collectively as categorical aid. If the formula takes local wealth into account, then the formula is referred to as equalized.

{¶ 50} Special education is funded by the state in addition to the basic aid formula. H.B. 650 and H.B. 770 require special education students to be counted in ADM for determining basic aid. R.C. 3317.03(A). In addition to basic aid, districts receive separate state aid for special education pupils based on a weighted ADM, which is calculated based on the severity of the student's disability. R.C. 3317.013, 3317.022(C), and 3317.02(F)(1) through (3). This treatment of handicapped students differs from the prior law, under which students whose education was separately funded were not also included in ADM for basic aid purposes. Former R.C. 3317.02(A), H.B. 215; former R.C. 3317.024(N), Am.Sub.S.B. No. 230, 146 Ohio Laws, Part VI, 10301, 10304.

{¶ 51} The state continued to fund education programs for gifted children through funding units separate from basic aid in 1999, R.C. 3317.024(P), and H.B. 650 increased the number of funding units available for FY99 from nine hundred twenty-seven to nine hundred fifty. In H.B. 770 the General Assembly stated that it would review and revise the formula used to fund education for gifted children. Former R.C. 3317.024(P)(2).

**{¶ 52}** Vocational education is another program for which districts receive funds from the state in addition to those provided by the basic aid formula. "The average vocational education additional cost per pupil can be expressed as a multiple of the base cost per pupil calculated under section 3317.012 of the Revised Code." R.C. 3317.014. Generally speaking, each vocational student is counted as one ADM in the basic aid calculation, R.C. 3317.03, and an additional percentage, which is called a "weight," is added to take into account additional costs incurred in providing vocational education. R.C. 3317.022(E).

**{¶ 53}** The state also pays for transportation costs apart from the basic aid formula. A district's predicted costs are based on the density of the student population and the number of miles traveled. R.C. 3317.022(D)(2). The state's share of calculated transportation costs in FY00 is 52.5 percent. R.C. 3317.022(D)(3). The percentage will increase annually until FY03, when the state's share will be sixty percent. *Id.*

**{¶ 54}** Disadvantaged Pupil Impact Aid ("DPIA") is available to districts that satisfy certain requirements. DPIA is designed to provide funding for programs such as all-day kindergarten and class-size reduction to provide a select group of students with individual attention. R.C. 3317.029.

**{¶ 55}** The present school-funding scheme contains a variety of guarantees and caps. For instance, there are guarantees for basic aid, R.C. 3317.0212, transportation funding, R.C. 3317.022(D)(4), and DPIA funding, R.C. 3317.029(B). Guarantees are often criticized because they tend to provide some districts with more money than they would receive under the foundation formula alone. "[G]uarantees work to the substantial benefit of wealthier districts and represent a flaw in the system of school funding, because they work against the equalization effect of the formula." *DeRolph I*, 78 Ohio St.3d at 200, 677 N.E.2d at 739. Warren G. Russell, the current Director of Legislative Services for the Ohio

School Boards Association, expressed the belief that the continued need for guarantees indicates that the basic aid formula has structural problems.

{¶ 56} Even though the current formula is almost identical to its predecessor, we acknowledge that the state has made some alterations to the school-funding scheme that was at issue in *DeRolph I*. See *id.*, 78 Ohio St.3d at 199-200, 218, 677 N.E.2d at 738-739, 751. However, this does not mean that we retreat from our mandate in *DeRolph I*, requiring Ohio's public school financing scheme to undergo a "complete systematic overhaul." *DeRolph I,* 78 Ohio St.3d at 212, 677 N.E.2d at 747. Our assessment of compliance with this mandate is qualitative rather than quantitative.

{¶ 57} In order to determine the cost of a basic education, the state engaged the services of Dr. John G. Augenblick, an expert in school finance. The state adopted Augenblick's methodology, with three significant changes, which ultimately lowered his base cost figure.

{¶ 58} The Augenblick methodology is an outputs-based approach, which uses the eighteen performance levels enumerated in S.B. 55 to ascertain whether a district is effective. R.C. 3302.02 and 3302.03(B)(1). A district that meets seventeen of the eighteen criteria is deemed an effective district. R.C. 3302.03(B)(1). Augenblick screened out some districts using criteria intended to measure administrative efficiency. In the first of the three changes to Augenblick's method, the General Assembly did not use this screening procedure.

{¶ 59} In the second change, the General Assembly enlarged the screen that was intended to remove anomalous districts in terms of personal income, from the fifth and ninety-fifth percentiles recommended by Augenblick to the tenth and ninetieth percentiles. According to Dr. Stephen P. Klein, an independent consultant, who is also employed as a Senior Research Scientist with Rand Corporation in Santa Monica, California, this change lowered the basic expenditure amount by "several hundred dollars."

24

{¶ 60} Using these two screens, Augenblick selected one hundred two districts. As a result of the first two changes, the method used by the General Assembly selected a substantially overlapping group of one hundred three districts. Of the one hundred three districts used, the district with the lowest base cost per pupil spent $2,755 per pupil, and the district with the highest base cost per pupil spent $5,898.

{¶ 61} In the third change, the method used to calculate the base figure was changed from a weighted per-pupil average to an unweighted district average, R.C. 3317.012, with no convincing rationale given for the change. This alteration further reduced the figure for the base cost of an adequate education.

{¶ 62} As a result of these three changes, the base cost of an adequate education was reduced from $4,269 for FY99 to $4,063. We can only hope that Howard Fleeter, an Assistant Professor in the School of Public Policy and Management at the Ohio State University, was incorrect when he opined that the legislature made these changes in order to come up with a lower number because some legislators were concerned with cost and the "necessity of responding to the *DeRolph* decision at all because of the feeling that the state had already made significant progress since 1991 and that they didn't need to do anything else."

{¶ 63} Although we recognize that deciding what methodology to adopt is a policy determination, we are perplexed by the General Assembly's actions of enlisting an expert in the area of school financing and then, with no adequate explanation, altering his method. According to Senator Robert Cupp, no one in the working group was an expert in statistics or Augenblick's methodology. Russell testified that he did not believe that the legislature had the expertise to understand the impact of the changes made to the Augenblick methodology and to grasp the statistical concepts involved. We share Russell's concern. Furthermore, Klein questioned whether the Augenblick methodology or the one adopted by the General Assembly would provide adequate funding for Ohio's public schools.

**{¶ 64}** Another matter that concerns us is the process of phasing in the base cost over a three-year period. See R.C. 3317.02(B). Because of the phase-in, the $4,063 figure that was deemed by R.C. 3317.012 to be the base cost of an adequate education for FY99 will not be reached until FY01 in inflation-adjusted dollars. We find it difficult to understand how the state can justify its position that it is funding a thorough and efficient education for Ohio's public school children when it is currently funding below the level that the General Assembly deemed to be the base amount for an adequate education.

B

*Budgetary Residual*

**{¶ 65}** In *DeRolph I*, we recognized that the state was funding education as a "residual after other mandated programs" were funded. *Id.,* 78 Ohio St.3d at 261, 677 N.E.2d at 780. This method for calculating the cost of a basic education involved determining how much money the state could afford for education and working backward to arrive at the per-pupil basic subsidy.

**{¶ 66}** According to Speaker Davidson, the General Assembly's response to the court's concern that "the formula amount has no relation to what it actually costs to educate a pupil" is the funding scheme set forth in H.B. 650 and H.B. 770. Speaker Davidson claimed that the General Assembly has made a commitment to fund primary and secondary education "based upon a rational methodology of adequacy," which is "locked into House Bill 650." Senator Cupp claimed that as a result, "there is no priority in that budget that now has a higher priority than education."

**{¶ 67}** The General Assembly divided the budget for the 2000-2001 biennium into two sections: H.B. 282, the Education Budget Bill, and H.B. 283, the Biennial Budget Bill. Prior to this, the budget had never been split into two separate bills, with one bill dedicated solely to the education budget. Both bills proceeded through the General Assembly together and were passed almost

simultaneously. Governor Taft signed H.B. 282, the Education Budget Bill, into law on June 29, 1999, and H.B. 283 the next day.

{¶ 68} The system's skeptics allege that residual budgeting remains despite the new legislation. Dr. Samuel Kern Alexander, the current president of Murray State University, a regional state university in Kentucky, criticized the formula for being unreliable and subject to manipulation. Alexander testified that "factors are just being added and subtracted to reach a dollar amount that is available, a predetermined, presumably, dollar amount that the Legislature can afford, and Dr. Augenblick is justifying it." In July 1997, Speaker Davidson stated that the General Assembly was considering lowering the $4,269 per pupil figure recommended by Augenblick because "the amount was calculated on inexact data and that lower per-pupil funding would help make up revenues lost from scrapping the cigarette tax and expanding property tax relief."

{¶ 69} We acknowledge the progress the General Assembly has made in this area. We give defendants the benefit of the doubt, particularly in light of recent developments, in their contention that they have not merely disguised residual budgeting. However, we cannot totally discount evidence that the actual cost might have been the deciding factor in selecting the method used to determine the base cost of an adequate education.

C

*School Facilities—Funding for Construction and Maintenance*

{¶ 70} In *DeRolph I*, we held that the Classroom Facilities Act, R.C. Chapter 3318, was unconstitutional to the extent that it was underfunded. *Id.*, 78 Ohio St.3d 193, 677 N.E.2d 733, syllabus. Our opinion presented graphic examples of some of the deplorable conditions existing in primary and secondary schools throughout the state. *Id.* at 206-208, 677 N.E.2d at 743-744. We further remarked that "state funding of school districts cannot be considered adequate if the districts lack sufficient funds to provide their students a safe and healthy learning environment." *Id.* at 208, 677 N.E.2d at 744.

{¶ 71} The Classroom Facilities Act in R.C. Chapter 3318 was enacted in 1957 and was substantially amended in May 1997. Am.Sub.S.B. No. 102. William L. Phillis, who serves as the executive director in a consultant relationship with the Ohio Coalition for Equity and Adequacy of School Funding, testified that "historically not much money had been put into that program until the beginning" of the 1990s. The 1990 Ohio Public School Facility Survey indicated that $10.2 billion was needed for facility repair and construction. *DeRolph I*, 78 Ohio St.3d at 206, 677 N.E.2d at 742. The amount required as of August 1997 was estimated to be $16.5 billion. Phillis also testified that a 1996 report issued by the United States General Accounting Office listed Ohio as the state having the highest percentage of school buildings with major flaws.

{¶ 72} The General Assembly's response to this situation was Am.Sub.S.B. No. 102, which was signed into law on May 5, 1997. S.B. 102 established the Ohio School Facilities Commission, R.C. 3318.30(A), which oversees the Classroom Facilities Assistance Program (R.C. 3318.02 through 3318.041), the Emergency School Building Repair Program (R.C. 3318.35), and the Big Eight Program (Section 7, S.B. 102).

{¶ 73} The commission is also charged with assessing all classroom facility needs and conditionally approving repair and construction projects. R.C. 3318.02(A) and 3318.04. Those districts whose adjusted valuation per pupil ranks in the lowest one to five percent shall have priority in project approval. R.C. 3318.02(B). Once the commission conditionally approves a district's project, the project is submitted to the State Controlling Board for final approval. R.C. 3318.04. If the board approves it, the district has one year to pass a half-mill levy representing its share of the cost. R.C. 3318.05. See, also, R.C. 3318.032. If the district does not pass a levy within that time, the conditional approval for the project shall lapse, and the amount reserved and encumbered for the project is released. R.C. 3318.05. If conditional approval for the district's project lapses, that district shall be given first priority for project funding as such funds become available. *Id.* The entire process, from approval of the project to its completion, may take as long as four years.

{¶ 74} S.B. 102 also established the Emergency School Building Repair Program in order to fund districts' urgent repair needs. R.C. 3318.35. Each eligible district that applied could receive up to $500,000 in emergency repair funds, and districts were not required to provide matching funds. As of trial, a total of two hundred fifty-four districts had received emergency repair funds, totaling $118 million.

{¶ 75} The Big Eight Program is a repair program for the eight school districts in the state that, roughly speaking, have more than twelve thousand pupils, thirty percent of whom receive Aid to Dependent Children. Section 7, S.B. 102. S.B. 102 set aside $100 million for this program, which requires these eight school districts to match funds received from the state and use them for major repairs and renovations of school facilities. *Id.*

{¶ 76} In July 1997, the General Assembly adopted Sub.H.B. No. 412, effective November 21, 1997. One of H.B. 412's provisions requires districts to

establish a capital and maintenance fund and to deposit "four per cent * * * of all revenues received by the district that would otherwise have been deposited in the general fund, except that money received from a permanent improvement levy authorized by section 5705.21 of the Revised Code may replace general revenue moneys in meeting the requirements of this section."  R.C. 3315.18(A).

{¶ 77} We recognize that the General Assembly has attempted to formulate a viable plan to fund the construction of new school facilities and to repair Ohio's decaying school buildings; however, we are not without concern.  For instance, a high school in the Mad River-Green Local School District in Clark County has a bathroom that is infested with a lethal mold.  Beacon Journal, "Schools Suffering Despite State's Fix" (Apr. 10, 2000).  This situation appears to be of an urgent nature, yet it has not been remedied.  Consequently, Mad River-Green Local Superintendent Denny Howell must keep the bathroom boarded up in order to prevent students from being exposed to the lethal mold that resulted from "a leak that allowed urine and feces to drain slowly into a ceiling."  The situation in the Mad River-Green Local School District is not an isolated incident.  Many other facilities issues plaguing our schools involve sewage problems.  At Park Street Middle School, in the South-Western City School District, a section of a locker room in the school's basement had to be sealed off due to a sewage backup. During a visit to one school, Phillis walked through a "stream of water" in the building and smelled the odor of sewage.

{¶ 78} Randall Fischer, the Executive Director of the Ohio School Facilities Commission, testified at the trial court hearing that except for the reserve for emergency repair funds, the funds available for the Classroom Facilities Assistance Program have been completely exhausted.  In light of this, Fischer testified that emergency situations were still in existence at the time of trial.  For example, thirteen schools in the Youngstown City School District did not receive funds for asbestos abatement.  Likewise, the Jackson City School District applied for but did

not receive funds for asbestos removal. The Ruhlin Company served as one of the Site Evaluation Team Leaders for the Ohio School Facilities Commission Emergency Repair Grant Program and visited over one hundred ten schools in forty-eight school districts in northwest Ohio. The Ruhlin Company made the following observations: "Many of these buildings were built in the 1920s and 1930s. Although the roofs are not original, many are over 20 years old and have reached the end of their expected life. Masonry tuckpointing has been neglected in many buildings and exterior windows are old and leaking. The electrical systems are not able to handle today's power requirements for computers, TV's and other electronic equipment. Because of the rural nature of many of the schools, well water and septic systems are utilized and do not meet today's current EPA standards and need [to be] replaced. Boilers are old and are nursed through each heating season with yearly retubings and expensive maintenance."

{¶ 79} Another troublesome aspect of the Classroom Facilities Assistance Program is that an eligible district must pass a levy within one year in order to receive funds from the state. R.C. 3318.05. Thus, a district that fails to pass a levy the first time must wait until the General Assembly appropriates more funds for the program and still must pass a levy as a condition of receiving the funds.

{¶ 80} Again, referring to the report compiled by Achieve, Inc., we note that "despite significant recent investments the challenge remains severe. Although estimates differ on the magnitude of the problem, *by all accounts too many Ohio children, especially in poor rural and urban districts, attend classes in dreadfully sub-standard facilities.* [Emphasis *sic*.] * * * During this decade [the 1990s] the state has invested over $1 billion in capital improvement funds for schools, more than tripling the investments made over the previous four decades. However, without a reliable inventory of the state's facilities and a solid cost estimate for bringing all Ohio school[s] up to standard, it is impossible to know just how much progress has been made. While the state has at least made a down payment on a

long deferred problem, *this is a major piece of unfinished business for Ohio's policymakers*." (Emphasis added.)

{¶ 81} In addition, according to Fischer, there is no degree of certainty as to what the future funding from the state will be. Am.Sub.H.B. No. 770, effective June 17, 1998, requires the Governor to recommend and request that no less than $300 million be appropriated annually to school facilities when future budgets are submitted to the General Assembly. R.C. 107.031. R.C. 107.031 merely requires that the Governor shall "ensure that among the various budget recommendations made * * * to the general assembly each biennium there are recommendations for appropriations to the Ohio school facilities commission, aggregating not less than three hundred million dollars per fiscal year." R.C. 107.031. Phillis testified that at a rate of $300 million per year, it would take fifty-five years to correct the $16.5 billion deficit, and this estimate does not take into account "rolling decay."

{¶ 82} While visiting some of Ohio's schools, Phillis made several observations. At trial, Phillis described a school building in the Morgan Local School District that was built before 1900 and has sunk approximately six inches. As a result of this settling, the doors no longer fit in their frames. Phillis visited a school that was heated with a coal-fired furnace and saw coal dust in the classrooms. During a visit to Bloom Carroll Middle School, which was built in the early 1900s, Phillis noticed that the brick on the building's façade was cracked. Additionally, Phillis noted that many of the buildings he visited lacked handicapped access.

{¶ 83} From the foregoing, it is readily apparent that this is an important area that will continue to require the attention of the Governor and future General Assemblies. We acknowledge the initiatives in Am.Sub.H.B. No. 850 (effective March 19, 1999), which appropriated $505 million for school facilities (see Sections 6 and 26 of the Act), and Am.Sub.H.B. No. 283, which appropriated an additional $325.7 million, by devoting money from the state's budget surplus to

school facilities. See Section 124 of the Act. When combined with moneys appropriated from Am.Sub.S.B. No. 102, Am.Sub.H.B. No. 215, Am.Sub.H.B. No. 650, and commitments from other sources, recent appropriations for facilities are in excess of $1.6 billion, yet the immediate needs are much greater. As recognized in the reply brief of *amicus curiae* Governor Taft, on September 9, 1999, the Governor proposed a school facilities allocation plan called "Rebuilding Ohio's Schools: A 12-Year Commitment." The plan proposes to allocate an additional $23.1 billion in state and local funds to school facilities from FY01 to FY12. The state share of that amount would be $10.2 billion, broken down into $5.9 billion from the capital budget, $1.8 billion from cash appropriations and interest earnings, and $2.5 billion from the state tobacco litigation settlement. The plan calls for the state share to be accompanied by $12.9 billion in local matching funds. In addition, the plan calls for the establishment of a trust fund with some of the tobacco settlement money to take care of future school needs.

{¶ 84} At the time of this writing, a significant component of the Governor's plan appears to be in place. On March 3, 2000, the Governor signed into law Am.Sub.S.B. No. 192, which provides for the distribution of money received by the state pursuant to the Tobacco Master Settlement Agreement. As pertinent to our consideration here, this legislation allocates nearly $2.5 billion in tobacco settlement funds through FY12 to go for school construction and repair, through the Education Facilities Trust Fund. See R.C. 183.02(F) and 183.26. The legislation also allocates funds for classroom technology, see R.C. 183.02(H) and 183.28, and establishes and allocates money to an Education Facilities Endowment Fund, with investment earnings transferred each quarter to the Facilities Trust Fund, R.C. 183.02(G) and 183.27. Provisions are also made addressing appropriations for school construction and repair from FY12 to FY25. Section 17 of the Act. The firmness of all the commitments contained within this legislation is of course limited by the prohibition of Section 22, Article II of the Ohio Constitution, which

prohibits the General Assembly from appropriating for more than a two-year period. Thus, even though the long-term plan is in place, the General Assembly must appropriate the money every two years.

{¶ 85} The task at hand is not one to be taken lightly. One-half of Ohio's school buildings are fifty years old or older. *DeRolph I,* 78 Ohio St.3d at 206, 677 N.E.2d at 742. Constructing and maintaining school buildings is an ongoing process, and this court recognizes that it would be unreasonable to require the General Assembly to remedy overnight what has taken decades of neglect to develop, yet there remains an extensive amount of work to be done in order to educate Ohio's students in "safe and healthy learning" environments. *Id.* at 208, 677 N.E.2d at 744. Continuing funding in this area is of the utmost importance.

D

*Borrowing*

{¶ 86} In *DeRolph I*, this court found the following provisions, relating to forced borrowing, unconstitutional: R.C. 133.301, which granted borrowing authority to school districts, and R.C. 3313.483, 3313.487, 3313.488, 3313.489, and 3313.4810, which provided for emergency school assistance loans. *Id.,* 78 Ohio St.3d 193, 677 N.E.2d 733, syllabus. These statutes were deemed to be an inherent weakness in the state's school-financing system because they required districts that were unable to satisfy their budgetary requirements to borrow funds at commercial lending rates. *Id.* at 201, 677 N.E.2d at 739. When these borrowing statutes were in effect, over $700 million was borrowed by local school districts so that they could keep their schools operating.

{¶ 87} The first type of borrowing held unconstitutional in *DeRolph I* was the "spending reserve" loan in R.C. 133.301, which enabled school districts to borrow against a subsequent year's revenue, as long as the district received approval from the Superintendent of Public Instruction. *Id.* at 201, 677 N.E.2d at 739. If the spending reserve loan was not enough to enable the district to meet

current operating needs, then the district was required to seek necessary funding from a commercial lender. *Id.* at 201, 677 N.E.2d at 739; R.C. 3313.483 and 3313.483(D). These borrowing programs, which were characterized by this court as "nothing less than a clever disguise for the state's failure to raise revenue sufficient to discharge its constitutional obligations," drove school districts into deeper financial distress. *Id.* at 202, 677 N.E.2d at 740.

{¶ 88} What is the status of forced borrowing today? Although the General Assembly has taken some steps to eliminate forced borrowing from the school-financing scheme, it remains unclear whether these changes will rectify the problem.

{¶ 89} The Spending Reserve Loan Program is being phased out pursuant to R.C. 5705.29(F)(1) and (2). Additionally, the School District Solvency Assistance Fund, which is operated by the Ohio Department of Education, was established in H.B. 412 and went into effect on November 21, 1997. R.C. 3316.20. The Solvency Assistance Fund provides interest-free "advancements to school districts to enable them to remain solvent and to pay unforeseeable expenses of a temporary or emergency nature that they are unable to pay from existing resources." *Id*.

{¶ 90} One concern voiced by Russell is that many districts will still be forced to borrow funds, because the circumstances that necessitated the initial borrowing still exist, despite the recent legislation. Likewise, Charles Brown, the Assistant Director of the Division of School Finance of the Ohio Department of Education, is concerned that H.B. 412's set-aside requirements will require additional borrowing in order to comply with the mandates.

{¶ 91} The plaintiffs allege that the School Solvency Assistance Fund is no different from the former Emergency School Assistance Loan Program, other than the fact that the School Solvency Assistance Program Fund provides for interest-free loans. According to Brown, the procedures for obtaining and repaying loans

are virtually identical under both programs. For instance, the repayment period for both types of loans is typically two years. Furthermore, districts must exhaust their spending reserve before they can access advances from the solvency fund. R.C. 3316.20. This requirement mirrors one in the former Emergency School Assistance Loan Program that required a district to borrow from its spending reserve fund before obtaining approval for an emergency loan. See R.C. 3313.483(B).

{¶ 92} In addition to our concerns about the impact that the School Solvency Assistance Fund will have on future borrowing, we are also troubled by the influence H.B. 650 and H.B. 770 will have. At his deposition, David Brunson, the Assistant Director of the Ohio Legislative Budget Office ("LBO"), testified that the LBO did not research or analyze the effect that H.B. 650 and H.B. 770 would have on borrowing. Moreover, Augenblick did not take borrowing or the repayment of existing loans into account in arriving at a base cost figure. Augenblick had no knowledge of the amount of money that school districts would be required to pay in FY99 for borrowing that occurred during and prior to 1999.

{¶ 93} The final loans under the former Emergency School Assistance Loan Program were approved by the State Controlling Board on February 9, 1998. Repayment of these loans will continue through at least 2007 and will be made from funds that districts would otherwise receive as school foundation payments.

{¶ 94} The lingering effects of the forced-borrowing scheme will haunt school districts for many years to come. As we examine the new legislation promulgated by the General Assembly in response to our holding in *DeRolph I*, we are dubious that the new measures will resolve the problem. We recognize that some type of borrowing provision may be necessary to provide funds in the case of extreme emergencies or unexpected calamities; however, any system that entails borrowing from future funds to meet ordinary expenses is not a thorough and efficient system. Except in extreme cases, reliance on loans must be eradicated,

and loans certainly must not be employed as a method to meet school districts' daily operational expenses.

E

*Overreliance on Local Property Taxes*

{¶ 95} In *DeRolph I*, this court held that one of the principal factors rendering the school-funding system unworkable was the state's heavy reliance on local property taxes to fund primary and secondary education. *Id.,* 78 Ohio St.3d at 212, 677 N.E.2d at 747. Our holding in *DeRolph I* did not say that local property taxes could not be a component of the state's school-funding formula, but rather that local property taxes could no longer be the primary means of providing for a thorough and efficient system of schools. See *id.* at 262, 677 N.E.2d at 780 (Resnick, J., concurring). For instance, in FY97, the state contributed approximately 43.8 percent to districts for school funding, excluding federal funds, while the local share was approximately 56.2 percent.

{¶ 96} Property taxes are still the single most important source of funding for schools, and seventy percent or more of all property taxes levied are allocated to public schools. Overreliance on local property taxes was one of the factors that rendered the school-funding scheme deficient, yet this aspect of the former system persists in the state's current funding plan, *wholly unchanged*. The system's dependence on local property taxes has resulted in vast disparities among Ohio's six hundred eleven public school districts due to the differences in revenue generated by each. For instance, according to a memorandum prepared by Mike Sobul at the Ohio Department of Taxation for the 1995 fiscal year, a one-mill property tax on Class I real property produced $272.90 per student in the district with the highest property tax base and $13.34 per student in the district with the lowest. A system that places too much reliance on local property taxes puts property-poor districts at a disadvantage because " 'they must tax at significantly higher rates in order to meet minimum requirements for accreditation; yet their

educational programs are typically inferior.' " *DeRolph I*, 78 Ohio St.3d at 204, 677 N.E.2d at 741, quoting *Edgewood Indep. School Dist. v. Kirby* (Tex.1989), 777 S.W.2d 391, 393.

{¶ 97} The state would like this court to believe that overreliance on local property taxes will dissipate once the new measures are fully phased in, so that the only reason a district would have to look to local property taxes would be that the district wants to fund beyond adequacy. Unfortunately, the reality of the situation at this time appears to be otherwise.

{¶ 98} A perfect example of overreliance on local property taxes is the situation currently affecting the Toledo Public Schools. Toledo schools are faced with an $18 million deficit, and in March voters rejected a 6.9-mill operating levy that would have provided Toledo schools with $17.1 million annually. Toledo Blade (Mar. 5 and Apr. 16, 2000). Now school officials may be forced to shut down two secondary schools and eliminate two hundred thirty-five teaching positions. This should not happen in a state-funded system of common schools.

{¶ 99} Moreover, recent legislation has the potential to actually increase reliance on local property taxes beyond the level deemed unsatisfactory in *DeRolph I*. The phase-out of the inventory tax in Am.Sub.H.B. No. 283 will result in significant revenue losses. See R.C. 5711.22(E). As of May 1999, inventory was assessed at a rate of twenty-five percent of its true value and then subjected to local property taxation. In 1997, inventory tax revenues provided 7.77 percent of the total local property tax revenue received by districts. The Legislative Budget Office estimates that as a result of the phase-out local school districts will lose $60.9 million in revenue in 2002. The state has provided minimal replacement revenue. According to a report prepared by Dr. Howard Fleeter in May 1999 for the Education Tax Policy Institute ("ETPI"),[2] this reduction "reduces the property tax

---

2. The Education Tax Policy Institute ("ETPI") was formed in 1977 to act as an "independent, data-driven organization" for the purpose of analyzing tax policy issues. ETPI's membership includes

revenues received by all of Ohio's local government entities, including school districts." Furthermore, Fleeter used data collected for the years 1984 through 1993 to reach the conclusion that "school district millage increases play an important role in ameliorating the decreases in revenue brought about by reductions" in the inventory rate. In fact, Fleeter's report establishes that "local tax increases served to reduce actual revenue losses in Ohio school districts by more than 50%." We are in accord with Fleeter's opinion that "the fact that local taxpayers are bearing at least some of the brunt of this state policy change seems inescapable."

{¶ 100} Additionally, the unfunded mandates in Sub.H.B. No. 412 and Am.Sub.S.B. No. 55 will likely require increased reliance on property taxes. These bills are projected to cost districts $343,758,940. According to Brown, districts may be forced to levy additional taxes in order to satisfy the set-aside requirements of H.B. 412.

{¶ 101} Ohio's system of public education is a "statewide system." *DeRolph I*, 78 Ohio St.3d at 213, 677 N.E.2d at 747. The state is responsible for funding an adequate education for all primary and secondary students who attend public schools. In our earlier opinion, this court informed the General Assembly that a school-funding scheme that relies too heavily on local property taxes for revenue would not satisfy the Thorough and Efficient Clause of the Ohio Constitution. See *id.* at 212, 677 N.E.2d at 747. Consequently, a revised funding scheme that increases reliance on local property taxes would not be "thorough and efficient." Thus, the General Assembly must avoid compounding the school-funding system's infirmities with new legislation that increases reliance on local property taxes.

{¶ 102} The state's failure to specifically address the school-funding system's overreliance on local property taxes is of paramount concern as we

approximately one hundred school districts and several state-level groups representing public sector organizations and employees.

evaluate the state's attempts to craft a thorough and efficient system of funding. The state's argument that it can minimize this problem by addressing the other aspects identified in *DeRolph I* as contributing to the unworkability of the system in place at that time, see 78 Ohio St.3d at 212, 677 N.E.2d at 747, is unconvincing. We see no indication that anything significant has been done to remove this primary impediment, which was the major factor in the previous funding system found unconstitutional in *DeRolph I*. No further effort at specifically addressing this overreliance on property taxes has been made since the voters of the state rejected the one-cent sales tax increase on the May 5, 1998 ballot. The problem of overreliance on local property taxes *must* be independently addressed, and all potential solutions to this problem must be explored. The inequities inherent in a system that relies too heavily on local property taxes will remain until this problem is resolved by the General Assembly.

F

*Phantom Revenue*

{¶ 103} The phenomenon known as "phantom revenue" is one of the weaknesses this court identified in *DeRolph I* as plaguing Ohio's system of school finance. *Id.*, 78 Ohio St.3d at 201, 677 N.E.2d at 739. Although phantom revenue is not easily defined, Frederick Church of the Legislative Budget Office says that it can be thought of as occurring "when the growing property wealth of a school district gives the illusion of a commensurably increasing revenue stream, which, in fact, is not realized."

{¶ 104} The consulting firm of Levin & Driscoll has identified three types of phantom revenue.

{¶ 105} "Type I" phantom revenue, which is sometimes referred to as "phantom millage," occurs when a school district fails to levy at least twenty-three effective mills. "[P]hantom revenue in this type equals the difference between the revenue obtained from the district's effective tax rate and the revenue that the

district would receive from a 23 mill effective rate." Type I phantom revenue can occur as a result of either the application of 1976 Am.Sub.H.B. No. 920, 136 Ohio Laws, Part II, 3182, or a district's failure to obtain voter approval for at least twenty-three mills. R.C. 319.301.

{¶ 106} Levin & Driscoll characterizes "Type II" phantom revenue as property tax revenue credited to a school district when its tax base increases, but which is never actually received by the district due to H.B. 920's tax-reduction factors, found in R.C. 319.301. See *DeRolph I* at 200-201, 677 N.E.2d at 739. R.C. 319.301 "requires the application of tax reduction factors when property values increase due to reappraisal or update." *Id.* at 201, 677 N.E.2d at 739. The purpose is to "limit the effect of inflation in property values on growth of real property tax revenues." *Id.* at 221, 677 N.E.2d at 753. R.C. 319.301 gives real property owners a tax credit, so that the amount paid on voted millage remains the same as it was prior to the reappraisal or update. Consequently, a school district receives the same amount of revenue "from voted tax levies after reappraisal as it did before reappraisal, notwithstanding that real property valuation in the district has increased through inflation since the time of the initial tax levy." *Id.* at 221, 677 N.E.2d at 753 (Douglas, J., concurring).

{¶ 107} "Type III" phantom revenue "results from the use of an income-adjusted tax base rather than actual taxable value for purposes of computing a school district's chargeoff." Type III phantom revenue is the difference between the revenue received from twenty-three mills and the yield required by the chargeoff.

{¶ 108} According to a report prepared by Levin & Driscoll, all three types of phantom revenue are problematic for school districts, because the basic aid formula "counts local revenue without empowering the district to raise that revenue."

**{¶ 109}** The state maintains that the phantom revenue problem has been resolved because H.B. 650 provides for a charge-off supplement and power equalization. R.C. 3317.0216(B) and (C); 3317.0215.

**{¶ 110}** The charge-off supplement is intended to ensure that districts obtain the full amount of state and local funds that the basic aid formula allocates to them. The charge-off supplement is also referred to as "gap aid." If a district's charge-off amount is greater than the district's total receipts available for current expenses, then the state will pay the district an amount representing the difference. R.C. 3317.0216(B). When new local revenue is generated, a district's charge-off supplement is reduced dollar for dollar.

**{¶ 111}** Power equalization is intended to act as an incentive for districts with below-average property wealth to levy more than twenty-three mills. Power equalization applies only to the Class I effective rate and mills between twenty-three and twenty-five. R.C. 5713.041; 3317.0215. "If the total effective operating tax rate of a district is greater than two and three-tenths per cent, the district shall receive a payment computed by multiplying the lesser of two-tenths of one per cent or the equalized tax rate by the amount by which the state taxable value per pupil exceeds the district's total taxable value per pupil times the district's formula ADM." R.C. 3317.0215(B). Maxwell provided the trial court with the following illustrative example of how power equalization works: if the valuation per pupil in the state were $95,000, then one mill would yield $95, and if an eligible district has a valuation per pupil of $55,000, then one mill would yield $55 per pupil. Since only $55 is raised locally, under the concept of power equalization, the state makes up the difference, $40, to arrive at the $95.

**{¶ 112}** In spite of provisions in H.B. 650, not every type of phantom revenue has disappeared. Although we are encouraged by testimony that the charge-off supplement is reducing Type I phantom revenue, we are mindful that this type of phantom revenue may continue in some districts. Furthermore, H.B.

650 does not alleviate Type II phantom revenue, which results from the application of H.B. 920's tax-reduction factors.

{¶ 113} Another concern is that H.B. 650 may even compound the phantom revenue predicament by creating additional types of phantom revenue. Both Russell and Maxwell testified that a new type of phantom revenue results from power equalization. Maxwell believes that since "property valuation increases due to reappraisal cause the millage rate to be reduced regularly," some districts may lose equalization payments and "would have to vote millage every time reappraisal occurs." Additionally, Maxwell testified that including special education pupils in a district's ADM creates a new type of phantom revenue. Ultimately, certain school districts may be required to go back to the voters and ask for additional tax increases to make up for lost revenue.

{¶ 114} Requiring school districts to seek additional tax increases to make up for lost revenue is something that should be avoided, especially in view of our holding in *DeRolph I*, which required overreliance on local property taxes to be eliminated. The Achieve, Inc. report quoted one school superintendent who stated, "I spend every third year running a political campaign, not running my school district." This is not how a thorough and efficient system should function and further serves to emphasize why heavy reliance on local property taxes must end.

G

*Accountability*

{¶ 115} In response to our decision in *DeRolph I*, the General Assembly enacted several new pieces of legislation. Two of the bills focus primarily on school district accountability: H.B. 412 is directed at fiscal accountability, and S.B. 55 establishes academic accountability.

*Fiscal Accountability: House Bill 412*

{¶ 116} H.B. 412 centers on implementing fiscal accountability for school districts. This bill contains three set-aside requirements: a capital and maintenance fund (R.C. 3315.18), a textbook and instructional materials fund (R.C. 3315.17), and a "reserve balance fund" (R.C. 5705.29[H]).

{¶ 117} R.C. 3315.18(A) requires each district's board of education to create a capital and maintenance fund and to deposit into that fund "four per cent of all revenues received by the district that would otherwise have been deposited in the general fund, except that money received from a permanent improvement levy authorized by section 5705.21 of the Revised Code may replace general revenue moneys" in meeting these requirements. Money placed in this fund can be used only for "acquisition, replacement, enhancement, maintenance, or repair of permanent improvements." *Id*. The four-percent requirement is phased in according to the schedule set forth in Ohio Adm.Code 117-2-23(B).

{¶ 118} R.C. 3315.17(A) requires each board of education to "establish a textbook and instructional materials fund" and to "deposit into that fund four per cent, or another percentage if established in rules adopted under division (C) of this section, of all revenues received by the district for operating expenses." The four-percent requirement is phased in according to the schedule set forth in Ohio Adm.Code 117-2-23(A). Money deposited in this fund "shall be used solely for textbooks, instructional software, and instructional materials, supplies, and equipment." R.C. 3315.17(A). If a district does not use all of these funds in a given

fiscal year, the funds carry forward to the next fiscal year. *Id.* Additionally, pursuant to subsection (D), a school district may opt out of this requirement. R.C. 3315.17(D). We are not addressing the content of the opt-out provision at this time.

{¶ 119} R.C. 5705.29(H)(1) requires each board of education to "establish a reserve balance account to accumulate currently available resources to stabilize the school district's budget against cyclical changes in revenues and expenditures." Subject to certain exceptions, see Ohio Adm.Code 117-2-24, "[t]he balance in the reserve balance account shall not at any time be less than five per cent of general fund revenues for the most recently concluded fiscal year." R.C. 5705.29(H)(1). Beginning in fiscal year 2000, a district is required, subject to limited exceptions, to set aside one percent of its revenue "until the balance in the reserve balance account equals five per cent of the district's revenues received for current expenses for the preceding fiscal year." R.C. 5705.29(H)(2)(a).

*Academic Accountability: Senate Bill 55*

{¶ 120} S.B. 55 is composed of various provisions mandating academic accountability. The bill raises the number of credits required for high school graduation (R.C. 3313.603[B]), creates a fourth-grade reading guarantee (R.C. 3313.608[A]), and sets standards for school district performance (R.C. 3302.02 and 3302.03).

{¶ 121} "Beginning September 15, 2001, the requirements for graduation from every high school shall include twenty-one units earned in grades nine through twelve." R.C. 3313.603(B). S.B. 55 increases the number of credits required for English language arts, mathematics, science, and social studies. R.C. 3313.603(B)(1), (3), (5), and (6).

{¶ 122} The fourth-grade reading guarantee states that "[b]eginning with students who enter fourth grade in the school year that starts July 1, 2001, no * * * school * * * shall promote to fifth grade any student who fails to attain" the designated score on the test prescribed in R.C. 3301.0710(A)(1) that measures

reading ability, unless either the pupil was excused from taking the test or the pupil is deemed to be "academically prepared" to be promoted to the fifth grade. R.C. 3313.608(A)(1) and (A)(2).

{¶ 123} Pursuant to S.B. 55, school districts will be rated on performance and receive annual report cards. R.C. 3302.03(A) and (D)(1). The provision for evaluating district performance states that beginning July 1, 1999 (FY00), "every three years the department of education shall calculate and report for each school district its percentages on each of the performance indicators listed in section 3302.02 of the Revised Code and shall specify for each such district the extent to which the acceptable performance indicator has been achieved and whether the district is an effective school district, needs continuous improvement, is under an academic watch, or is in a state of academic emergency." R.C. 3302.03(A). In addition to performance reports, the Department of Education is required to "issue annual report cards for each school district and for the state as a whole based on education and fiscal performance data." R.C. 3302.03(D)(1).

*Discussion of Accountability*

{¶ 124} Jeffrey Sutton, the state's attorney, described the current school-funding system as placing "[k]ids first, money second," and having "accountability throughout." We agree that accountability is an important component of a system that provides funds. What is problematic, however, is a system that increases academic requirements and accountability, yet fails to provide adequate funding.

{¶ 125} A Fiscal Note and Local Impact Statement prepared by the Ohio Legislative Budget Office for S.B. 55 indicated that the "state would increase its school funding in the range of a billion dollars per year beginning in FY 1999" and that this "funding increase would help districts to make any necessary changes to meet performance standards proposed by the bill." The increased funding was not part of S.B. 55 and was dependent on voter approval of a one-cent sales tax increase. Both S.B. 55 and H.B. 412 were proceeding through the General Assembly at the

same time as the proposed sales tax increase. On February 17, 1998, the Ohio Senate approved H.B. 697, which placed the one-cent sales tax increase on the May 5, 1998 ballot for voter approval. The one-cent sales tax increase, which appeared on the May 5 ballot as Issue 2, was not approved by voters. Consequently, school districts are required to adhere to the bills' additional requirements and standards of accountability, but the anticipated funding must now come from a different source.

{¶ 126} Since these mandates are essentially unfunded, a paramount concern is that H.B. 412 and S.B. 55 will impose additional costs on school districts. David Brunson testified that the Legislative Budget Office did not do a detailed analysis to estimate what the cost of S.B. 55's increased graduation requirements would be throughout the state; however, the Fiscal Note indicates that those "districts that currently require less than 21 units of credit for graduation would incur additional costs." The Legislative Budget Office conducted a random survey of twenty school districts in an attempt to determine the potential impact of S.B. 55, and fourteen of the twenty districts indicated that they would incur additional expenses as a result of the bill. Additional costs may be incurred in establishing appropriate scientific laboratories and in hiring more teachers, especially those qualified to teach mathematics and science courses. The Department of Education estimates that the average cost for a biology laboratory is $140,000. Districts may also face increased costs as a consequence of R.C. 3313.608(B) through (E), which require remediation and intervention services for those students who do not pass the fourth-grade reading test. What is particularly bothersome about these unfunded mandates is that if a district does not have sufficient funds in its existing budget, then it may have to seek additional funds from other sources, such as passing additional levies or borrowing from lenders.

{¶ 127} From the foregoing discussion regarding academic accountability, we do not want our concerns to be misconstrued as disfavor for the general concept

of accountability. Instead, we clearly state that in order to have a thorough and efficient system of schools, there must be statewide standards that are fully developed, clearly stated, and understood by educators, students, and parents. The report compiled by Achieve, Inc. succinctly sets forth the perspective that "*states need to have at the heart of their education reform strategy clear and rigorous academic standards, challenging assessments designed to measure progress against those standards, and an accountability system that rewards success and takes action against persistent failure.* We do not mean to suggest that standards, assessment, and accountability can *by themselves* produce significant changes in student performance; but they can and should be important drivers of change in curriculum, instructional practice, and school organization. They need, most importantly, to be accompanied by a thoughtful, comprehensive, sustained strategy for strengthening the capacity of teachers, principals, and other education professionals to change their practice, and a commitment to provide extra resources and support to students and schools who start out furthest from the goal line. But without a clear roadmap for teachers, parents, and students (*i.e.*, standards), an agreed-upon yardstick for measuring progress (*i.e.*, assessments) and consequences for results (*i.e.*, accountability), states in our view are unlikely to help their schools significantly improve student performance. Ohio has important building blocks in place in its standards-assessment-accountability system, but we believe each of these elements needs to be substantially strengthened if this system is to become a powerful lever for improving teaching and learning in the classroom." (Emphasis *sic*.)

{¶ 128} The Achieve, Inc. report recognized that the lack of standards was a significant deficiency in Ohio's system. The report noted that "*[s]trictly speaking, Ohio does not really have statewide academic standards, at least as that term is used in most other states*. The absence of standards is particularly troublesome because virtually all participants in Ohio education reform activities

agree that clear standards should be the basis for pre-service training for teachers, the curriculum, student assessments, classroom materials, and ongoing professional development. Unless there is clear understanding of what students are expected to learn, how can teachers' colleges know what teachers are supposed to teach? How can assessment developers know what to test? How can publishers of textbooks and instructional materials know what to include at each grade level? How can students prepare for the tests if there is no clear-cut agreement about what they are supposed to learn?" (Emphasis *sic*.)

{¶ 129} Some of the same concerns encountered with regard to S.B. 55 arise with respect to the set-aside requirements in H.B. 412. According to Maxwell and Goff, those districts that are most likely to be affected are the ones borrowing or paying back money that was previously borrowed. A Fiscal Note and Local Impact Statement prepared by the LBO for H.B. 412 predicts that the four-percent set-aside requirement for capital and maintenance and the four-percent set-aside for textbooks and instructional materials could *each* total approximately $400 million statewide.

{¶ 130} From the foregoing, it is readily apparent that a great deal of work has yet to be done before Ohio can be said to have a constitutional thorough and efficient system of public schools. We recognize that much more is involved in this process than merely providing funds. Consequently, educators, lawmakers, businesses, parents, and students must all work together to strengthen Ohio's system of public schools.

{¶ 131} Governor Taft recognized this need in his January 19, 2000 State of the State Address, when he said, "Education is a matter of survival in today's world and the [proficiency] tests are helping to lift student achievement. We must never retreat from high standards, rigorous assessment and accountability for results! In fact, I believe we can do even more to build on our success and help students reach those high standards, not only on the fourth grade test but also on

the new tenth grade exams. That's why we must closely align what we expect, what we teach, how we assess, and how we reward performance and correct failure."

{¶ 132} Strict statewide standards must be developed and implemented, so teachers know what they are required to teach, and students know what they are required to learn. Governor Taft has recognized this need and has taken steps in the right direction, as evidenced by his January 19, 2000 State of the State Address in which he declared, "So today, I propose to establish the Governor's Commission for Student Success. Its members will represent employers, colleges and universities, parents and children, educators, school board members and legislators. I will ask this commission to address four questions:

"How do we make it crystal clear to students, parents, and educators what students should know and be able to do in each grade and before graduation?

"How should we measure student performance and progress in each grade?

"How should we hold students and adults responsible for academic achievement?

"And how do we make sure that all parts of the system work together in complete alignment?"

IV

CONCLUSION

{¶ 133} At the present time, it is apparent to us that, despite the past and present efforts of Governor Taft and our General Assembly, the mandate of the Constitution has not yet been fulfilled. We acknowledge the effort that has been made, and that a good faith attempt to comply with the constitutional requirements has been mounted, but even more is required. The process must continue.

{¶ 134} The most glaring weakness in the state's attempts to put in place a thorough and efficient system of education is the failure to specifically address the overreliance on local property taxes. If this problem is not rectified, it will be virtually impossible for the revised school-funding system to be characterized as thorough and efficient.

{¶ 135} Despite our vast concerns over the failure to address the funding system's overemphasis on local property tax, we do perceive evidence of some positive developments. Finally the Governor and General Assembly have recognized that education can no longer be funded as a residual in the state budget. Funding must be provided consistently with the Section 2, Article VI constitutional mandate of a "thorough and efficient system of common schools." With the recent passage of H.B. 282, there is now a separate state budget for education. In addition, Governor Taft has provided the impetus for recent initiatives to provide significantly more money for school building construction and maintenance.

{¶ 136} Furthermore, other significant initiatives are being developed. The SchoolNet and SchoolNet Plus programs, recognizing the value of developing computer-literate students, continue to evolve and are clearly positive steps. See H.B. 282, R.C. 3301.80 and 3301.801. Yet there is so much yet to be done in this area. We are still a long way from the goal of providing sufficient computers to allow a high quality education in this computer age. Moreover, there is no specific

program in place to provide computers for students above the fifth-grade level. This is a crucial need so that students nearing graduation will be computer-literate.

{¶ 137} The OhioReads initiative put into motion by Am.Sub.H.B. No. 1, effective March 30, 1999, is another laudable step being championed by the Governor. See R.C. 3301.85 *et seq*. By providing several types of grants (both to schools and communities, see R.C. 3301.86 and 3301.87) to promote the fourth-grade reading guarantee, and also by encouraging volunteer tutors to become involved in their local school districts (see R.C. 3301.91[A]), OhioReads appears to be a significant agent for improvement. Yet only time will tell if this initiative will be successful in furthering the goals of the fourth-grade reading guarantee.

{¶ 138} In light of the progress that the Governor and General Assembly have made, in some areas, thus far, and unwilling to reject *in toto* the sum of those efforts, we determine that the best course of action at this time is to provide the defendants more time to comply with Section 2, Article VI of the Ohio Constitution. We are confident that, given the additional opportunity presented by this extension of time, the General Assembly and the Governor will continue to deliberate over the many obstacles they face, and will continue to seek solutions to these complex problems.

{¶ 139} The following major areas warrant further attention, study, and development by the General Assembly, but are not by any means the only areas requiring scrutiny:

(1) Continued reliance on local property taxes as a primary means to fund Ohio's schools has not been specifically addressed and may in fact be compounded by H.B. 283's phase-out of the inventory tax, which may result in even greater reliance on local contributions in the future. The failure to address this problem will make it exceedingly difficult for any system of school funding to comply with the Thorough and Efficient Clause, since the inherent inequities will remain.

(2)  The basic aid formula has structural deficiencies and may not in fact reflect the amount required per pupil to provide an adequate education.  The phase-in aspect of the basic aid amount should be reconsidered.

(3)  Continuing attention must be given to the mechanism implemented to fund the construction of new school facilities and to repair older, decaying school buildings, until the task is complete.  Additionally, requiring local districts to pass levies as a prerequisite for obtaining state funding should be reviewed.

(4)  The School Solvency Assistance Fund established by H.B. 412 must be reevaluated, so that funds are available and used only in case of extreme emergencies and not for unfunded mandates or day-to-day expenses.

(5)  The unfunded mandates in H.B. 412 and S.B. 55, which will necessitate either increased reliance on local property taxes or additional borrowing from the School Solvency Assistance Fund, must be addressed and immediately funded.

(6)  The phenomenon known as phantom revenue has not been eliminated and may increase as a consequence of H.B. 650.

(7)  Strict, statewide academic guidelines must be developed and rigorously followed throughout all of Ohio's public school districts.

{¶ 140} The foregoing are the major areas that necessitate further attention and review by all parties involved in Ohio's educational system.  We hope that partisan views will be put aside and that everyone will work cooperatively for Ohio's children, as they are our future.  The General Assembly, in particular, must look beyond the political considerations involved, and must provide Ohio's school children with a thorough and efficient system of common schools as the Ohio Constitution requires.

{¶ 141} As the Achieve, Inc. report noted, "this may be a propitious moment to forge a new social compact between Ohio's government policymakers and its education community.  The terms of the compact would be relatively simple and straightforward:  governmental leaders will commit to fix the funding system

and provide adequate time and resources to enable educators to develop the skills they need to teach to higher standards, in return for which the education community will agree to be held accountable for making annual, measurable progress in helping virtually all young people meet higher academic standards.

" * * *

" * * * Now is the time for Ohio's governmental, educational, and corporate leaders to forge a new agreement to enable local communities and their schools to move forward to realize those goals."

{¶ 142} Governor Taft is providing the leadership to establish this compact, and now is the time for the General Assembly, educators, corporate leaders, and parents to join his efforts. As a result of this combined effort, Ohio can succeed in providing all young people with a thorough and efficient system of public schools pursuant to Section 2, Article VI of the Ohio Constitution.

{¶ 143} We affirm those portions of the trial court decision that are consistent with the foregoing opinion. We decline to appoint a special master to oversee the state's further efforts to comply with Section 2, Article VI. This court will maintain continuing jurisdiction. The matter is continued to June 15, 2001, at which time this court will establish a briefing schedule.

*So ordered.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

DOUGLAS and F.E. SWEENEY, JJ., concur separately.

PFEIFER, J., concurs separately.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

COOK, J., separately dissents.

———————————

**DOUGLAS, J., concurring.**

{¶ 144} On March 24, 1997, this court released the opinion in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"). The opinion

included a strong dissent severely castigating the majority for violating the separation of powers doctrine and for deciding a nonjusticiable question. *Id.* at 264-283, 677 N.E.2d at 780-795. Joining this chorus were the then Governor of Ohio, the leaders and some other members of the General Assembly, several large Ohio newspapers through their reporting and editorial facilities, and a few representatives of business interests. The message was always the same—there is a crazy majority in the Ohio Supreme Court and, with the school-funding decision, Armageddon is at hand. Notwithstanding all of that clamor and criticism,[3] the *DeRolph I* majority remained silent even though the temptation to respond was great. It is now fair to say that, three years later, the world has not come to an end, the republic has survived, and there is light at the end of the tunnel.

{¶ 145} Admittedly, the tunnel is long, the road remains full of potholes, and the ultimate success of the journey is still in doubt, but we at least are on our way. I believe that any fair-minded observer of the controversy would have to admit that sans *DeRolph I* we would not have progressed to the point at which we find ourselves today. Due at least in part to *DeRolph I,* thousands of Ohio's young citizens attending schools, teachers, principals, superintendents, and other administrators are better off educationally than they were three years ago. Of course, as with every contested issue, some will say that not enough has been done and others will say that we have now reached the golden gates and no further action is needed. All we can do, as Justice Resnick has so well done, is to take the facts as they are presented to us, apply the law, and then reach a decision that accommodates without capitulation, sheds light rather than heat, and constructively builds rather than destroys. Unfortunately, not everyone joins us in this quest on behalf of Ohio's education system.

---

3. Canon 3(B)(2) of the Code of Judicial Conduct states that "[a] judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor, or fear of criticism."

**{¶ 146}** The dissenters herein, once again, criticize the majority for doing anything—then criticize us for not doing enough. They can't have it both ways, and the majority opinion, recognizing this dichotomy, strikes a balance by, in specifics, respectfully pointing out the constitutional shortcomings of the General Assembly's remedial efforts while refraining from mandating a particular course of action. In doing so the majority further respects and recognizes that it is the right and prerogative, as well as the sworn sacred duty, of the members of the General Assembly to put in place the nuts and bolts of our state's educational system. In this regard, many of the proposals of the Ohio Coalition for Equity and Adequacy of School Funding, such as "A Call To Build: Appropriate 21st Century School Facilities" (Apr. 2000), while well-documented and well-researched, are specifics (details) to be debated and decided by the General Assembly rather than this court. Our sole mission is to see to it that the Constitution is honored and that Section 2, Article VI of the Ohio Constitution is being obeyed.[4] When it has been, we should say so. When it has not—then it is our duty to say that too.

**{¶ 147}** Central to all of this is the role of Governor Bob Taft. As we have seen in other states,[5] Governors can be and are the players, more than any other persons or institutions, with the standing and clout to shape the direction of policymaking in education. The only caveat is that a Governor must choose to lead. Ours has! The attention he and his staff have devoted to the school facilities

---

4. It is well to repeat just what this section of the Constitution provides—as opposed to what a number of pundits have tried to make it say: "*The general assembly* shall make such provisions, by taxation, or otherwise, *as*, with the income arising from the school trust fund, *will secure a thorough and efficient system of common schools throughout the State.*" (Emphasis added.)

5. To date the Supreme Courts of sixteen of our sister states have found their state's school funding system unconstitutional, interpreting language in their Constitutions that is, in many, exactly or remarkably like the words used in our Ohio Constitution. See *DeRolph I*, 78 Ohio St.3d at 204, 677 N.E.2d at 741 (naming fourteen states); see, also, *Claremont School Dist. v. Governor* (1997), 142 N.H. 462, 703 A.2d 1353; *Opinion of the Justices No. 338* (Ala.1993), 624 So.2d 107. In addition, twelve other states have school funding litigation pending at some level. Viewing these statistics, it would seem that our action in *DeRolph I* was not such an aberration after all.

problem has been extraordinary.  He has chosen to immerse himself personally in the never-ending death struggle that generally comes before passage of anything worthwhile in education.  He has lent and continues to lend credence to the age-old adage that Governors "usually get what they want."  It is not unconstitutional to say that with his leadership "all things are possible."

{¶ 148} It is also fair to say that with the notable exception of the dissenters herein, a number of the severest critics of the majority decision in *DeRolph I* have responsibly moved to help decision-makers reach consensus on many of the divisive issues.  Significant, among others, was the lead editorial in The Columbus Dispatch of Thursday, April 13, 2000, titled "Classroom Math."  The first paragraph said that "Gov. Bob Taft's proposal to spend $1 billion in the next two years to fix or replace deteriorating school buildings in the state deserves full support in the General Assembly."  The last paragraph said, "Clearly, Ohio's leaders have taken the court's ruling seriously and have reoriented state priorities to put education needs at the top of the list."  Such pronouncements have not gone unnoticed or unappreciated.

{¶ 149} While much more could be said, in writing now I confine myself to two specific matters.  I believe that these matters lie at the heart of the next phase of the continued quest for a constitutional funding system that strives, at the very least, for an equal opportunity for all of Ohio's school-age students to receive a basic "thorough and efficient" education.

I

Am. Sub. H.B. No. 650 ("H.B. 650")

Am. Sub. H.B. No. 770 ("H.B. 770")

{¶ 150} As so well set out by Justice Resnick in the lead opinion, H.B. 650, as supplemented by H.B. 770, is the cornerstone of the General Assembly's school-funding-formula remedy.  While the lead opinion properly points out a number of remaining concerns with this legislative remedy, I also join the majority opinion

because I, somewhat differently, believe that the General Assembly has made a good-faith effort at progress and that we should give its handiwork time to prove itself worthy and, if the effort falls short, then there is time enough for the Governor and the legislature to fine-tune, tinker with, and/or scrap what has been done in their (and our) incessant search to do what is constitutional, necessary, and right.

{¶ 151} For me the heart of H.B. 650 is the "caps" formula. The General Assembly had to balance the complexities of urban districts, poor districts, wealthy districts, and districts with growing and declining enrollment. Just as with shoes, no one size fits all. Thus the initial nine-and-one-half-percent and eleven-percent caps for the first effective year and the ten-percent and twelve-percent caps for the next year were necessary both fiscally and logistically. While the caps appear to help some districts and hurt some districts, a real start has been made and, for me, the redeeming feature is that all caps roll off in the year 2002 when the formula will take full effect. At that time, if I understand the formula, major increases in state-funded support will then take effect in a number of our state's neediest school districts.

{¶ 152} Is that soon enough? Will the level of support be adequate? Can those districts in trouble survive the wait? Districts in the greatest need, and there are more than one hundred, will answer "no." Those persons in charge of making policy and finding the finances to make progress will answer "yes." The majority of this court answers "maybe," and therein lies the reasoning for the one-year grace period provided in the lead opinion.

{¶ 153} Obviously, this counsels patience. I recognize that Ludwig Börne (1786-1837), a German political author and satirist, had a point when he once said, "Not through patience, but through impatience, are peoples liberated." The International Dictionary of Thoughts (1969) 543. However, Edmund Burke (1729-1797), an eighteenth-century British statesman, political writer, and orator, allowed that "[o]ur patience will achieve more than our force." *Id.* With patience acorns

become oak trees; aggregate, sand, and cement become concrete; and revolutions spawn democracies. Force, on the other hand, even if available, is to be eschewed as only compounding an already difficult problem. John Milton (1608-1674), the English poet, was instructive when he counseled that "[w]ho overcomes by force, hath overcome but half his foe." *Id*. at 298.

**{¶ 154}** While the education revolution, in which we are all engaged, seems to be endless, it is well to remember the progress that has been made in just the three short years since *DeRolph I,* especially when compared with the twenty-one-year period (and before) since this court issued its decision in *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813.

**{¶ 155}** Is there still work to be done? Yes—substantial—which brings me to my second issue.

II

Overreliance on Local Property Taxes

**{¶ 156}** In Part III(E) of the majority opinion, Justice Resnick, ably and without flourish, lays out the brutal facts. Those facts and the conclusions to which they lead are inescapable. When the foundation of a structure is weak and is built on shifting sand, the structure is doomed to fall. While well-meaning at its inception and effectively marketed (by those who would avoid their responsibility) under the rubric of local control, heavy reliance on local property taxes for school funding is the inherent weakness in the foundation and, inevitably, the structure will continue to fall—piece by piece—until this difficult issue is met, at least in part, head-on.

**{¶ 157}** None would dispute the importance of education to the very existence of democracy. Scholarly commentators at home and abroad (Alexis de Tocqueville and Baron Acton, to name two) often made the point that our education system in America, open to all regardless of rank or residence in our society,

favorably set us apart from life in European societies. How then has our system, at one time so widely acclaimed, grown progressively weaker? While it is contended that there are other reasons such as lack of accountability, waste, control by others than school boards and administrators, family failures and discipline, it must also be conceded, I believe, by any fair-minded observer that funding, and the method of funding, also factors large into the equation. This should not surprise us, as the problem is not of recent vintage.

{¶ 158} It is interesting to note that from the beginning of our republic, the method for funding public education did not support the goal of having an equal and open educational opportunity for all. In 1777, when Thomas Jefferson was Governor of Virginia, he shepherded through the House of Burgesses a bill whose purpose was "For the Greater Diffusion of Knowledge." Unfortunately, and it is a familiar story in many of our United States, the Virginia legislature did not provide an adequate funding structure to support the legislation Jefferson had caused to be enacted. Sometime later, in the 1820s and just before Jefferson's death, he recognized the weak and faulty foundation of educational funding when he lamented the actions of his beloved state by expressing his disappointment that the legislature had not provided commonwealth-wide taxes to support education but, instead, had provided an educational funding system based on local, town-by-town taxation. Jefferson said that such a system would never work because the wealthier towns in the commonwealth would never support the education of those children who found themselves in the poorer towns of the commonwealth. That was one hundred eighty years ago, and, as in so many other venues where we hark back to the revered genius of Monticello, we again find him right. This is where we have found ourselves for a long time in our state, and all that has happened is that the problem has grown worse. This is where we found ourselves at the time of *Walter* (1979) and *DeRolph I* (1997). And this is where we still find ourselves today.

{¶ 159} For whatever reason, the General Assembly has chosen to ignore this basic fundamental problem and our request that something be done to reverse the course of heavy reliance on local property taxes. In fact, since *DeRolph I*, the problem has been exacerbated. Local share of total funding vis-à-vis state share of total funding has increased since 1997. All the while, since our decision in March 1997, not only was the local tax issue ignored, but also the General Assembly has given tax refunds of $1,257,474,801 to Ohio citizens that, I would venture to say, most Ohioans (including me) didn't even realize we were receiving. If even one-half of that sum had been applied to the total $6,000,000,000 of local real estate and personal property taxes paid to support our common schools, a one-time reduction of ten percent of those taxes could have been realized with the promise that we are moving in the right direction (a dollar-for-dollar shift to sales and income taxes) and that more effort would follow. Instead, we see yet today that there is talk in the General Assembly of yet another tax refund of millions and millions of dollars with no consideration being given to the fundamental problem that causes the lack of equal protection (opportunity) for all of Ohio's elementary and secondary students.

{¶ 160} In March of this year, one hundred sixty-one school districts in Ohio had to seek additional local funds from their voters to operate, repair, and/or build their schools. The passage rate was sixty-eight percent. Thus it is clear that the citizens of Ohio are doing and are prepared to do their part. Notwithstanding this, an overwhelming majority of these good citizens have asked this court for our help because others have been unresponsive. Well over five hundred of Ohio's six hundred eleven school districts are party plaintiffs in this suit. The response of the dissenters herein, who so severely take us to task for having a different view than they do, is, "Just stay out of it."

{¶ 161} In 1996, at the Jesse Fell Lecture Series at Illinois State University, Distinguished Professor Emeritus George Alan Karnes Wallis Hickrod said that

"[w]e have a society that is increasingly unequal, we have schools that are increasingly unequal, and if we do not do something about it we will end up with an increasingly well educated 'elite' and an increasingly poorly educated 'underclass.' No responsible observer that I know expects democracy to do well under those conditions." Our mission statement cannot be better stated. The cause of educational opportunity is a noble one. We should not shrink from our duty. In order to meet the dictates of Section 2, Article VI of the Ohio Constitution, the General Assembly must, as Governor Engler and the legislature did in the state of Michigan, actively pursue a solution to the continued heavy overreliance on local property taxes for school funding. Unless and until that happens, it is difficult to see how any legislative response would make this case go away—a hope that all involved fondly cherish.

### III

{¶ 162} It is easy to criticize. It is far more difficult to be a problem-solver than a problem maker. The majority herein prefers to be problem-solvers by helping the Governor and General Assembly solve a problem that, by any objective appraisal and appraiser, has existed for far too long. The dissenters would continue the status quo by simply saying "Let George do it."[6] Well, my valued colleagues, "George" hasn't done it! It is obvious that "George" was nowhere to be found until our decision in *DeRolph I*. Now the dissenters would have us say "all is well" when even they know that would be calumny of the first order.

{¶ 163} The prophets of gloom and doom have now declared that they were right. The court should just have ignored the plaintiffs and their hard evidence and given only a wink to our Constitution. They warned us, they say, thus attempting to bring about their own self-fulfilling prophecy. But where would the kids and

---

6. "George" is generic in nature and makes reference to no particular individual, dead or alive.

school system of this state be today if the dissenters in *DeRolph I* had prevailed? Just to ask the question answers it. I, very respectfully, concur.

F.E. SWEENEY, J., concurs in the foregoing concurring opinion.

_____

**PFEIFER, J., concurring.**

{¶ 164} Two very different constitutional interpretations and consequential courses of action are again laid out by the members of this court.

{¶ 165} There is, of course, the simple and efficient alternative constitutional interpretation offered by Chief Justice Moyer and Justices Cook and Lundberg Stratton. Despite the state's failure ever to advance this theory, my dissenting colleagues continue to argue that Section 2, Article VI of the Ohio Constitution has no discernible meaning, or if it has meaning, it is up to the General Assembly rather than this court to interpret its meaning and decide upon compliance.

{¶ 166} In doing so, the dissenters pay no heed to *Cincinnati City School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 384, 12 O.O.3d 327, 336, 390 N.E.2d 813, 824, where this court stated that "the issue concerning legislation passed by the General Assembly pursuant to Section 2, Article VI of the Ohio Constitution presents a justiciable controversy." In the dissenters' view, this court is unable to interpret the phrase "thorough and efficient" and should therefore not even try. But, see, *id.*, 58 Ohio St.2d at 383, 12 O.O.3d at 336, 390 N.E.2d at 823 ("We wish to state clearly at the outset that this court has the authority, and indeed the duty, to review legislation to determine its constitutionality under the Constitution of Ohio and to declare statutes inoperative."). Instead, my dissenting colleagues would essentially throw up their hands in dismay at the difficulty of interpreting two rather common words: "thorough" and "efficient" are, after all, used every day by both common and uncommon people.

**{¶ 167}** Their approach strikes at the core of constitutional law, that courts are the final arbiters of what the Constitution means, which was decided long ago. See *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60. See, also, *Walter*, 58 Ohio St.2d at 383, 12 O.O.3d at 336, 390 N.E.2d at 823 ("The doctrine of judicial review is so well established that it is beyond cavil.").

**{¶ 168}** They quote one college professor, a legal encyclopedia, and a second-year law student. They do not, however, mention *Marbury* or any of the hundreds, perhaps thousands, of cases decided in this country, in which judges have declared federal or state legislation to be unconstitutional. They essentially state that the Thorough and Efficient Clause is little more than an aspiration, even if it is part of Ohio's Constitution.

**{¶ 169}** It is a very tidy solution—simple, efficient and inexpensive. Unfortunately, it would turn two hundred years of constitutional jurisprudence, dating back to *Marbury v. Madison*, on its head. It also would allow the General Assembly to continue to disregard the section of the Constitution that mandates a "thorough and efficient" education system. See *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776.

**{¶ 170}** Despite the protestations of my dissenting colleagues and some members of the General Assembly, this court's decision in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733, is binding legal authority in this state. Subsequent to the announcement of this court's March 24, 1997 *DeRolph* decision, the General Assembly has slowly embarked on a course of action that addressed some well-documented deficiencies in Ohio's system of public education, but only marginally confronted the constitutional shortcomings that are at the core of this case. Specific and detailed guidance is apparently required, and now possibly is even desired by the General Assembly.

{¶ 171} "The general assembly shall make such provisions * * * as * * * will secure a thorough and efficient system of common schools throughout the state." Section 2, Article VI, Constitution of the State of Ohio.

{¶ 172} The first step toward constitutional compliance is monumental. It requires acceptance of the fact that the simple declaration of Section 2 was intended by the framers to, and therefore does, require a specific and ongoing duty to act. Presumably, a respect for the Ohio Constitution and for this court's duty to interpret it will help foster that realization.

{¶ 173} The second step, setting statewide minimum educational requirements, while subject to continued revision, is seemingly in place and not the subject of dispute in this case. The State Department of Education and the General Assembly have determined what constitutes a basic education. This court has not been a part of that discussion. The reason that *DeRolph* is here is not because the state does not know what it takes to provide a basic education, but because some children are not receiving what the state has determined that they need. For example, setting minimum requirements for the availability of basic modern textbooks and computers does not meet the mandate of Section 2, Article VI when those standards are simply not met for many school children. It is the duty of the state to ensure actual compliance with its own standards.

{¶ 174} Assessing the cost of those basic requirements is where the state continues to stumble. Compliance with minimum requirements would necessarily entail a certain threshold minimum cost. Here the state did understand this court in *DeRolph* and undertook the task of determining minimum cost. However, new programming and other new mandated local school expenditures were not included in the calculation. The incomplete minimum cost in dollar value, having been determined, was then fractionally reduced and *then* complete compliance was deferred for several years. Finally, no provision was made to update this financial cost measurement for each biannual budget.

{¶ 175} The bedrock constitutional challenge undertaken in this case focuses on the horrible funding inequities that persist between school districts in Ohio due to the state's heavy reliance on local property taxes in formulating the school foundation formula. That was the constitutional tripwire in *DeRolph I* and could not have been set forth more forcefully by this court. It is in conquering this colossus that the General Assembly decided to polish up the existing formula, declare victory, and call in their legal team without attempting the climb.

{¶ 176} Local property taxes raise such a mountain of money that it is not realistic to expect total replacement. That is not what the Constitution requires, nor was it suggested by this court. What is required is an immediate good faith effort to comply with the Constitution.

{¶ 177} Getting there is fourth grade math. First, determine an honest per-pupil current minimum operating cost. Next, determine the minimum property tax millage rate that every school district in Ohio will be expected to collect in support of the minimum operating cost. Finally, fill the gaps by adopting a minimum state school foundation formula that lifts every school district and school student in this state to the minimum dollar target beginning this next school year. Those simple steps, properly completed, will bring the state to the threshold of constitutional compliance. It is not a very high place.

{¶ 178} There will still be room for a supplemental education budget that allows legislators to provide, on a rational basis, extra state funds for all the special needs of children in circumstances that merit targeted funding.

{¶ 179} Tracking in tandem with these school-funding issues are the considerable school facilities deficiencies. While the school building problems are much easier to visualize, they are somewhat harder to fit into a mold of constitutional compliance or noncompliance. Unfortunately, school facilities have become so desperate that Ohio has been ranked at or near the bottom of the nation

by outside observers of these conditions. It is the shame of low rankings rather than the hammer of this litigation that has prompted legislative action.

{¶ 180} Is the state's commitment large enough, fast enough, or certain enough? Certainty is a constitutional impossibility, given a constitutionally mandated two-year budget cycle. The dollar amount is large, but so is the documented need. Section 2, Article VI would appear to be met by a plan that commits the state to a timely path of remediation and includes a method for constant review of the need and for acceleration of assistance when warranted.

{¶ 181} This case is not about high standards. It is about a constitutionally required foundation of basic educational opportunity. The difficulty lies not in building that foundation, but in sustaining *a democracy* without it.

_____

**MOYER, C.J., dissenting.**

{¶ 182} The sole issue now before us, as it was in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), is whether the Ohio General Assembly has violated the words and intent of the Ohio Constitution that require it to "make such provisions, by taxation or otherwise, as * * * will secure a thorough and efficient system of common schools throughout the State." Section 2, Article VI of the Ohio Constitution. In *DeRolph I* a majority of this court held that Ohio school-financing laws then in place did not comply with this constitutional provision.

{¶ 183} I, along with Justices Cook and Lundberg Stratton, dissented, recognizing that the General Assembly had in fact established a statewide school system in which schools were open, teachers were teaching, buses were running, and all Ohio children had available to them an opportunity to learn. Our dissent was based on our conviction that resolution of issues of the level and method of school funding is dependent upon judgments regarding the quality of education to be provided by the state. It was further grounded on our firm belief that constitutional history, precedent, and logic warrant the conclusion that those

qualitative judgments should be committed to the will of the people as expressed in the election of representatives to the General Assembly and local school boards and in the determination of voted taxation issues to support the schools. In short, the determination of what constitutes minimum levels of educational opportunity to be provided to Ohio's children is committed by the Ohio Constitution to legitimate policy makers—not the courts, whose proper role is interpretation and application of law.

{¶ 184} The wide divergence of opinion between the majority and the minority members of this court as to proper interpretation of the Thorough and Efficient Clause, as manifested in the various separate opinions in *DeRolph I*, remains. I continue to believe that decisions regarding the level of educational quality to be made available to Ohio school children are dependent upon policy decisions— political, budgetary, and value judgments—that require a balancing of interests that is not appropriately struck in the Supreme Court of Ohio. "The judicial branch is simply neither equipped nor empowered to make these kinds of decisions." *DeRolph I*, 78 Ohio St.3d at 269, 677 N.E.2d at 785-786 (Moyer, C.J., dissenting).

{¶ 185} Today the majority, having examined the current statutory school-funding system, acknowledges that significant steps have been taken since our decision in *DeRolph I* by the General Assembly, as well as by two Ohio Governors, to improve public elementary and secondary education in our state. The majority summarizes a multitude of initiatives adopted by the executive and legislative branches in recent years to improve school quality in Ohio, and specifically recognizes that the General Assembly has taken steps to "formulate a viable plan to fund the construction of new school facilities and to repair" physical deficiencies in Ohio school buildings. The majority recognizes the complexity of the educational system, and describes the task of reforming that system as one of "unparalleled magnitude."

{¶ 186} What the majority fails to fully recount is the magnitude of the state's monetary commitment to education. Pursuant to the Classroom Facilities Act, from

1990 to May 1998, twenty-three new construction projects had been completed and fourteen more were under construction. The General Assembly has earmarked $1.6 billion for the School Facilities Commission for classroom facilities improvements since *DeRolph I.* Funding for technology improvements in the schools totaled $256 million at the time of trial before the common pleas court in 1998, 1997 Am.Sub.S.B. No. 215, Section 69, with additional funding of $196 million appropriated in 1999, Am.Sub.H.B. No. 282, Section 11. The General Assembly has provided a $50 million textbook subsidy for all but the wealthiest school districts, 1997 Am.Sub.H.B. No. 215, Sections 50 and 50.16. Since fiscal year 1991, the Department of Education has received the largest increase in state dollars of any agency, totaling approximately $1.7 billion, and receives more state money than any other agency or department in the state.

{¶ 187} Nevertheless, although the majority acknowledges progress in achieving the criteria set in *DeRolph I*, including significant initiatives and developments, it concludes that "a great deal of work has yet to be done before Ohio can be said to have a constitutional thorough and efficient system of public schools."

{¶ 188} The majority retains jurisdiction of this case for at least another year, after which it will again scrutinize the public school statutory framework in light of its own unpredictable and indefinite concepts of educational thoroughness and efficiency. In the interim, the General Assembly and the executive branch of government are asked to further improve the system, in accordance with direction created by the majority which remains vague and generalized. In so doing, and while recognizing that the coequal executive and legislative branches of government have acted in good faith to comply with *DeRolph I*, the majority in effect claims veto power over policy determinations made by the General Assembly, thereby reserving to itself ultimate authority over public educational policy within the state.

{¶ 189} In *DeRolph I*, our joint dissent expressed the view that the majority had failed to provide the General Assembly with sufficient guidance for creating a

constitutional school-financing system and noted that "[a]spirational phrases urging that state financing of educational systems enable citizens to 'fully develop their human potential,' and afford 'high quality educational opportunities' are no more amenable to judicial interpretation or enforcement than is the term 'thorough and efficient.'" 78 Ohio St.3d at 268-269, 677 N.E.2d at 785. This criticism applies to today's majority opinion as well. The majority still has not clearly told the General Assembly what "thorough and efficient" means, or what "overreliance" on property tax is, or what would constitute the kind of educational opportunity it believes the Ohio Constitution guarantees to every Ohio child. Instead, the majority today tells the General Assembly once again to go back to the drawing board, while not describing in a meaningful way what the final design must look like.

{¶ 190} Today the majority elevates two statements from *Miller v. Korns* (1923), 107 Ohio St. 287, 140 N.E. 773, to syllabus law. Paragraph one of the syllabus provides that the General Assembly must secure not merely a system of common schools but rather a thorough and efficient system of common schools. The second paragraph of today's syllabus provides that the attainment of efficiency and thoroughness in that system is a statewide purpose, that is, efficiency and thoroughness throughout the state are goals toward which the General Assembly should strive. I do not object to adoption of these principles, although I remain committed to the proposition that determination of whether Ohio's public school system is thorough and efficient is committed by the Constitution to the General Assembly itself.

{¶ 191} The third paragraph of the syllabus constitutes an attempt to define the phrases "thorough system" and "efficient system." The majority defines a thorough system as one in which each and every school district has "enough" funds to operate, and an efficient system as one in which each and every school district has "ample" teachers and equipment, "sufficient for all students to be afforded an educational opportunity," as well as buildings compliant with building and fire codes.

However, in attempting to clarify the ambiguous phrase "thorough and efficient," the majority merely substitutes additional ambiguous and subjective criteria. Whether a district has "enough" funds, or an "ample" number of teachers, is in the eye of the beholder.

{¶ 192} Moreover, I take issue with the majority's conclusion that an efficient system is dependent upon "each and every school district" in the state meeting the criteria. The majority thereby shifts its focus from analysis of the educational *system* to case-by-case analysis of individual school districts, and presumably individual schools themselves. One can only infer that the majority intends to retain jurisdiction of this case until it finds every school in the state to be thorough and efficient, even though the Constitution requires, by its own terms, only a thorough and efficient system—not a system in which every school is thorough and efficient.

{¶ 193} This inference is reinforced by the majority's recitation of instances of deficiencies in individual schools, *e.g*., schools with mold-infested bathrooms, or schools plagued by sewage problems. But problems in individual schools do not in and of themselves demonstrate a failure of the statewide system of common schools as a whole. For instance, William L. Phillis, executive director of the Ohio Coalition for Equity and Adequacy of School Funding, testified at trial that he walked through a "stream of water" and smelled the odor of sewage at Park Street Middle School, in the South-Western City School District, where a section of a locker room in the school's basement had to be sealed off due to a sewage backup. However, in November 1998, voters in the South-Western City School District approved a 4.92-mill bond issue to build seven new schools and improve others. See South-Western City Schools web site, *http://www.swcs.k12.oh.us/construction.htm*. Park Street Middle School is to be demolished following the scheduled opening in 2001 of a new intermediate school, now under construction. See *id.* at *http://www.swcs.k12.oh.us/psms.htm*. The statewide system of common schools in

effect in 1998 thus appears to have been adequate to correct the problem described by Phillis's anecdotal evidence.

{¶ 194} One need not have served on a board of education to know that the condition of the physical facilities, the quality of school learning materials, the salaries of teachers and employees, and the efficiency of school administrators are determined, in large measure, by decisions made in each local school district. The majority opinion takes no account of that significant reality.

{¶ 195} Nor do I agree that the mandate of the Constitution to the General Assembly to establish a thorough and efficient system of common schools is equivalent to a mandate that the General Assembly establish a *state-funded* system of common schools. Even accepting the proposition that Ohio's system of public education is to be a "statewide system," I disagree with the majority's statement that the "*state is responsible for funding* an adequate education for all primary and secondary students who attend public schools." (Emphasis added.) What words of the Constitution preclude a system in which local school districts are held even partially responsible for funding a basic education at local schools? An overriding state obligation may be desirable, but the issue before us is the interpretation of a constitutional mandate, not the desirability of a particular legislative policy.

{¶ 196} Furthermore, such a construction is totally inconsistent with the history of education in Ohio as well as the circumstances surrounding public education at the time the Thorough and Efficient Clause was adopted. See *DeRolph I*, 78 Ohio St.3d at 280, 677 N.E.2d at 793 (Moyer, C.J., dissenting) ("While it is true that the framers of our Education Clause envisioned educational opportunity for all, the framers contemporaneously acknowledged and approved of a statewide educational system in which local districts were primarily responsible for providing educational opportunity to their children. When the Education Clause was adopted, determination of adequacy was dependent upon the resources available at the local

level and the amount local residents were willing to spend on educating local children.").

{¶ 197} The majority includes a list of seven major areas that it asks the General Assembly to scrutinize, and presumably change, before the majority will relinquish jurisdiction of this case. However, the list raises questions with no answers.

{¶ 198} For instance, the majority finds fault with continued "reliance" on local property taxes as a "primary" means to fund Ohio's schools. Each member of this court may hold an opinion regarding the appropriateness of the real property tax versus other more uniform or statewide forms of taxation, but that has never been the test for determining the constitutionality of statutory law. The majority notes that statewide, state funding constitutes forty-four percent of the total, excluding federal funds, versus fifty-six percent from local funding, and implicitly finds that proportion to be constitutionally deficient as a primary reliance or an overreliance on local property tax, even though the majority has already conceded that property tax may be continued as a legitimate source of school funding. *DeRolph v. State* (1997*)*, 78 Ohio St.3d 419, 419-421, 678 N.E.2d 886, 887.

{¶ 199} Today the majority says the General Assembly has not gone far enough in increasing the proportion of state funding to local funding, noting that "this aspect of the former system [overreliance on local property tax] persists in the state's current funding plan, *wholly unchanged*." (Emphasis *sic*.) It makes this statement despite the fact that the poorest Ohio school districts now receive roughly ninety percent of new construction costs in state aid, with a ten-percent local contribution. "Reliance," however, remains undefined, let alone "overreliance." If the percentage of local to state funding were inverted would that be sufficient, or is the majority seeking only a fifty-one-percent reliance on state funds? In stating that the General Assembly must establish a state-funded system of common schools, the majority hints, without expressly saying, that it intends to retain jurisdiction until the property tax component of school funding is significantly changed, or eliminated, despite its

earlier ruling that local property taxes could be part of a constitutionally acceptable revised funding plan. *DeRolph v. State*, 78 Ohio St.3d at 419, 678 N.E.2d at 887. But ultimately one can only guess as to the meaning of these terms.

{¶ 200} Moreover, reliance on property tax has very little, if anything, to do with thoroughness and efficiency. The majority explicitly observes that the flaw in dependence on local property tax is the creation of "vast disparities among Ohio's six hundred eleven public school districts," noting that it puts "property-poor districts at a disadvantage." But these are statements directed not to the adequacy of funding of the public schools, but rather to the equity of the system. Indeed, the majority opinion more than once suggests that the fundamental problem with property tax funding is that it creates inequities. Yet this court has previously expressly rejected the contention that the Ohio Constitution mandates equal educational opportunity throughout the state. *DeRolph I*, 78 Ohio St.3d at 211, 677 N.E.2d at 746.

{¶ 201} Even while claiming not to be retreating from its prior mandate in *DeRolph I* that the General Assembly make a "complete systematic overhaul" and "create an entirely new school financing system," *id.*, 78 Ohio St.3d at 212 and 213, 677 N.E.2d at 747, the majority asks the General Assembly to give further attention to the basic aid formula and the phenomenon of phantom revenue attributable in part to 1976 Am.Sub.S.B. No. 920, 136 Ohio Laws, Part II, 3182, and to 1998 Am.Sub.H.B. No. 650, both of which affect local, *i.e.*, property-tax-based school funding. In view of the majority's earlier position that property tax need not be eliminated as a source of school funding, it remains unclear whether the General Assembly can eliminate overreliance on property tax by simply fine-tuning the underlying formulas of the current school-funding method or must instead eliminate it.

{¶ 202} This court has still not provided a positive definition of a thorough and efficient system of common schools or outlined its constituent elements in a meaningful way. The majority again today reiterates its standard for a thorough and

efficient system by quoting *Miller v. Korns,* 107 Ohio St. at 298, 140 N.E. at 776: "A thorough system *could not mean* one in which part or any number of the school districts of the state were starved for funds. An efficient system *could not mean* one in which part or any number of the school districts of the state lacked teachers, buildings, or equipment." (Emphasis added.) But although hypothesizing as to what would *not* be thorough and efficient, neither the *Miller* court nor the majority has defined that phrase positively, except to say that an "ample" number of teachers and "sufficient" equipment affording all students "educational opportunity" must be provided, in buildings compliant with state building and fire codes.

{¶ 203} Similarly, the majority notes that this court in *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 387, 12 O.O.3d 327, 338, 390 N.E.2d 813, 825, determined that the state's educational system would not be deemed thorough and efficient if school districts received so little funding from all sources that students were "being *deprived of educational opportunity*." (Emphasis added.) But again, this phrase is inherently ambiguous and is left unclarified by the majority. Does it mean deprivation of *all* educational opportunity, such as described in *Miller*, *i.e.*, where children have no schools, no teachers, no books? If so, such a situation simply does not currently exist in Ohio, nor did it exist at the time of *DeRolph I*.

{¶ 204} I believe that the majority instead means that students in a thorough and efficient system must be provided educational opportunities that meet a level of quality that it, rather than the people of the state speaking through their elected representatives, finds satisfactory. The majority is really saying that it does not think that the minimum educational standards now in place are high enough, thereby substituting its own judgment of educational sufficiency for constitutional analysis.

{¶ 205} For example, the majority implies that a thorough and efficient system of common schools providing educational opportunity to its students now includes as a required element the provision of sufficient computers to allow students nearing graduation to be computer-literate. Some members of the General Assembly may

share this view, along with Governor Taft, as demonstrated by his 2000 State of the State Address. But that fact is of no legal relevance and does not change the fact that decisions as to the universal provision of computers, or advanced placement courses, or multiple foreign language offerings remain decisions of educational policy that are appropriately made only by the legislative and executive branches of government.

{¶ 206} I am additionally dismayed by the majority's apparent expansion of its view of thoroughness and efficiency beyond the issues of school financing and improvement of physical school facilities, which was the focus of *DeRolph I*, as reflected in its syllabus.

{¶ 207} The majority cites with approval a March 1999 report of Achieve, Inc. That report acknowledged that state education funding has increased by approximately fifty percent, with the greatest increase in low-wealth school districts, and recounted other "substantial new investments" in education. The report then opines that remedying funding and spending disparities and facilities deficiencies might not be enough, stating that other requirements of a thorough and efficient system of education must be developed. The Achieve Report further advised that "clear and rigorous academic standards, challenging assessments designed to measure progress against those standards, and an accountability system that rewards success and takes action against persistent failure" constitute the heart of education reform.

{¶ 208} But the experts who developed the Achieve Report were reporting to legitimate policymakers, members of the legislative and executive branches—not judges. Indeed, Achieve, Inc. describes itself as existing to provide advice and assistance *to state policy leaders* on issues of academic standards, assessment, and accountability. The opinions contained in its report were not intended to constitute a legal or constitutional analysis, nor are the members of the organization necessarily competent to provide one. Nevertheless, with this report as its underpinning, the majority expands the constitutional concept of a thorough and efficient system beyond

*DeRolph I* and suggests that student success is yet another criterion by which the thoroughness and efficiency of Ohio schools is to be judged.

{¶ 209} The majority concludes that "thoroughness and efficiency embrace far more than simply adequate funding" and that "[e]ven if the system were very generously funded, if other factors are ignored, it might still not be thorough and efficient." It states that "much more is involved in this process than merely providing funds" before it will find Ohio's public education system to be thorough and efficient. Moreover, the majority states, "If students have access to the latest technology but cannot take advantage of it, then our state has failed them. If students have the most up-to-date textbooks but cannot comprehend the material in those books, then our state has failed them."

{¶ 210} The majority's suggestion that Ohio policymakers must establish criteria of academic success and then assess the performance of Ohio students against those criteria in an attempt to demonstrate accountability in order to meet the constitutional mandate of a "thorough and efficient system," while perhaps well intentioned, is not constitutionally required. It thus hints that the ultimate criterion of thoroughness and efficiency is whether some undefined percentage of Ohio students are achieving academically.

{¶ 211} Measurement of academic achievement is a goal we can all support, but it is not a reasonable criterion against which the thoroughness and efficiency of Ohio's system of providing public schools should be judged. In my view, it is neither appropriate nor fair to hold the educational system ultimately responsible for failings that may be attributable to individuals, or the greater society, rather than to the educational system itself. As noted in the joint dissent to *DeRolph I*, proficiency test results are not necessarily correlated to expenditures, and external socioeconomic factors may be more significant. 78 Ohio St.3d at 279, 677 N.E.2d at 792. See Rodgers & Rodgers, Centralized Wisdom? DeRolph v. State and the Rise of Judicial Paternalism (1997), 45 Cleve.St.L.Rev. 753, 765-766, citing various research findings

supporting this conclusion, including a Cleveland Plain Dealer analysis concluding that "factors related to families and economic opportunity—not school districts—most influence how well students perform on standardized tests." See, also, Traub, What No School Can Do, New York Times Magazine (Jan. 16, 2000) 52, 54-55 ("[M]oney does not buy educational equality. Although the premise of many a crusading volume, including Jonathan Kozol's 'Savage Inequalities,' is that ghetto schools have been allowed to rot, many of the most catastrophically failing school districts, like Newark's [New Jersey], spend far more money per student than do middle-class communities nearby. Labor economists have had a field day proving that school spending is not correlated with school achievement.").

{¶ 212} I also take issue with the majority's discussion of the process and possible motivations by which the General Assembly arrived at the figure of $4,063 for FY99 as the base cost of an adequate education. It is of no consequence to this court or to its constitutional analysis *how* the General Assembly produced the legislation we review. It is our responsibility to examine only the final result in light of the Constitution. Laws adopted by the General Assembly need not be perfect, nor is the method or motives by which they are created of any judicial concern.

{¶ 213} Even assuming that they are of our concern, why is the majority so averse to placing its confidence in a Governor who has dramatically and effectively expressed his deep commitment to improving public education in Ohio and in a General Assembly that has increased public expenditures at record levels? The work is their work to do. I have confidence in their will and in their ability to do it.

Conclusion

{¶ 214} In *DeRolph I* the majority placed itself in the constitutionally uncomfortable position of ordering the General Assembly to pass remedial legislation. Today's majority opinion oversteps the bounds of appropriate judicial review of legislative enactments, going so far as to decree that the General Assembly give its "undivided attention" to realizing the majority's vision of constitutionally adequate

public education, even while purporting to give deference to the principle that it is this court's role to "decide issues of constitutionality—not to legislate." Such an admonition of a supreme court to a legislature is not appropriate. So long as the majority reserves ultimate veto power over any new funding system, its protest that it is not retaining control over educational policy in Ohio should convince no one.

{¶ 215} The majority states that "educators, lawmakers, businesses, parents, and students must all work together to strengthen Ohio's system of public schools." No person who cares about education, and I and my fellow dissenting justices do indeed care deeply about education, is likely to disagree with this expression of such a laudable goal. However, in the final analysis, that declaration constitutes the expression of the majority's estimation of good public policy; it has nothing to do with constitutional law.

{¶ 216} The majority's disposition of this case is legally unwarranted and inappropriate. See Rodgers, *supra,* 45 Cleve.St.L.Rev. at 753-754 (stating that this court's decision in *DeRolph I* is "dangerous precedent, inasmuch as it dispirits the sacrosanct role a legislature assumes in a democratic society and overtly legitimizes judicial policymaking" and its "vision of a thorough and efficient school system, via more economic parity, ultimately undermines the General Assembly of the State and will not extricate Ohio schools," while further predicting that the decision will "markedly fail to advance the quality of the Ohio public school system").

{¶ 217} Our fear as dissenters in *DeRolph I*, 78 Ohio St.3d at 270, 677 N.E.2d at 786, that the judicial intervention in development of state educational policy that the majority began would necessitate deeper judicial involvement over time is unfortunately being realized. This case is now over eight years old, with no end in sight. The likelihood of protracted judicial supervision over public education by this court for many years to come appears certain. The majority's failure to define educational thoroughness and efficiency, while taking the position that it will know it

when it sees it, only makes it more likely, if not certain, that judicial involvement will continue indefinitely.

{¶ 218} The appellees did not demonstrate a violation of the Ohio Constitution in 1997 when *DeRolph I* was decided, nor have they in the record before us. I therefore respectfully dissent.

COOK and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

———————————

**COOK, J., dissenting.**

{¶ 219} I view the majority opinions in *DeRolph I* and now *DeRolph II* as proceeding from a faulty premise—that Ohio's Thorough and Efficient Clause provides the basis for this court to continually veto and/or revise the policy decisions of our coequal branch, the General Assembly.

{¶ 220} Professor David Mayer of Capital University advances the argument that the premise is faulty by analogizing Ohio's Thorough and Efficient Clause to the clause in the United States Constitution that empowers Congress to "provide for the common Defence." David N. Mayer, DeRolph School Funding Ruling Goes Against Bedrock Principles, Toledo Blade (Sept. 12, 1998); see, also, Section 8, Article I, United States Constitution. The two clauses are structurally similar—both include the directive word "shall." Mayer suggests that we imagine the federal courts declaring the military budget unconstitutional based on the "common Defence" provision. This is implausible enough, Mayer notes, but would the United States Supreme Court then order Congress to prioritize a certain defense system above all other national budgetary concerns and give Congress a year to allocate sufficient funds? As Mayer concludes, such an order would be "absurd— a flagrant intrusion by one branch of government upon the prerogatives of another branch." *Id.*

{¶ 221} Our case suffers, at its core, from the same absurdity. That absurdity is why this court will continue to find itself, as it does today, in a quagmire concerning its role in *remedying* the unconstitutionality that it finds. Today this court publishes an opinion that concedes on one page that its role is "not to legislate" but merely to "decide issues of constitutionality," and on another page asserts the power to "require a revision" of the General Assembly's enactments.

{¶ 222} Instead of compounding our errors, we ought to use this, our second review of the merits of the constitutionality claim, to acknowledge our prior misjudgment. We should be conceding in this opinion that the Thorough and Efficient Clause is so imprecise and so incapable of adequate and meaningful enforcement that it is not self-executing. See *State v. Williams* (2000), 88 Ohio St.3d 513, 728 N.E.2d 342. Like the constitutional declaration we examined only recently in *Williams*—that all Ohio citizens possess inalienable rights to life, liberty, property, happiness, and safety—the Thorough and Efficient Clause is standardless and incomplete. *Id.* "[A] constitutional provision which depends upon legislative action for its effectiveness is *ipso facto* not self-executing * * *." 16 American Jurisprudence 2d (1998), Constitutional Law, Section 103.

{¶ 223} Even if the non-self-executing Thorough and Efficient Clause could be the basis for this court's finding that certain legislation is *void*, it does not follow that this court—as opposed to the General Assembly, to which the constitutional provision is directed—has any role in fashioning a *remedy* for a violation. American Jurisprudence cites an Ohio Supreme Court case for this proposition of constitutional law: "Even if a constitutional provision contains a mandatory requirement that the legislature adopt a particular provision, *there is no remedy if the legislature fails to obey * * *. [I]t is for the legislature to choose the time and form for carrying out the command.*" (Emphasis added.) *Id.,* Section 99, citing *Ursuline Academy of Cleveland v. Bd. of Tax Appeals* (1943), 141 Ohio St. 563, 26 O.O. 152, 49 N.E.2d 674, overruled in part on other grounds by *Denison*

*Univ. v. Bd. of Tax Appeals* (1965), 2 Ohio St.2d 17, 31 O.O.2d 10, 205 N.E.2d 896; *Palmer v. Bd. of Edn. of Union Free School Dist. No. 2, Town of Geddes, Onondaga Cty.* (1937), 276 N.Y. 222, 11 N.E.2d 887.

{¶ 224} I have raised this point in a prior dissent. *DeRolph v. State* (1998), 83 Ohio St.3d 1208, 1209, 699 N.E.2d 516, 517 (Cook, J., dissenting) ("Nor can this court alter the balance of constitutional power by ordering the legislature to pass new laws as part of a 'remedy.' "). I do so again because I view this court's ill-conceived foray outside its legitimate role to be a most serious affront to individual freedom and democratic ideals. By not abiding by the American form of government, we invite a lessening of public trust in the court as an institution.

_____